[Cite as *Oryann, Ltd. v. SL & MB, L.L.C.*, 2015-Ohio-5461.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| ORYANN, LTD., | : | **O P I N I O N** |
| Plaintiff-Appellee/ | : | |
| Cross-Appellant, | | **CASE NO. 2014-L-119** |
| - vs - | : | |
| SL & MB, LLC, et al., | : | |
| Defendants-Appellants/ | : | |
| Cross-Appellees. | | |
| | : | |

Civil Appeal from the Lake County Court of Common Pleas, Case No. 12 CV 003055.

Judgment: Affirmed in part, reversed in part, and remanded.

*Richard D. Eisenberg*, 1413 Golden Gate Boulevard, Suite 200, Mayfield Heights, OH 44124 (For Plaintiff-Appellee/Cross-Appellant).

*Dennis J. Ibold,* Petersen & Ibold, Inc., 401 South Street, Bldg. 1-A, Chardon, OH 44024-1495 (For Defendants-Appellants/Cross-Appellees).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellants, SL & MB, LLC, et al., appeal the judgment of the Lake County Court of Common Pleas, following a bench trial, finding its contract to sell the assets of its horse-boarding business to appellee, Oryann LTD., is unenforceable for lack of consideration. Oryann cross-appeals the trial court's judgment finding that Oryann failed to prove its fraud claim against SL & MB. For the reasons that follow, we affirm in part; reverse in part and remand.

{¶2} Gregg Battersby and his former wife, appellant, Amy Virant, bought the subject 24-acre horse farm on Billings Road in Kirtland, Ohio in 1992. The property included a main house, a barn, a cottage, an office building, and an arena. They operated the property as a horse farm and a horse-boarding facility and also resided in the main house. Sometime after they bought the farm, Gregg and Amy formed a limited liability company called SL & MB, LLC. They transferred ownership of the farm to SL & MB, and continued to operate the horse-boarding business and reside on the farm. Gregg was the managing member of SL & MB and Amy was its only other member.

{¶3} In or about 2006, Gregg and Amy divorced. Amy continued to reside on the property, and Gregg moved to South Carolina. In 2006, SL & MB listed the property for sale for $1.2 million. SL & MB received two offers to purchase the property, but neither sale was completed. In August 2010, a realtor contacted Gregg, and said he had an interested buyer for the property, one Denver Barry.

{¶4} Over the course of nearly one year, Gregg and Denver engaged in extensive negotiations for the purchase of the farm. Denver told Gregg he was buying the property for his daughter, Tracy Barry, for her to keep her horses and to operate the property as a horse farm. During these negotiations, Gregg remained in South Carolina, and did not return to the property. Gregg and Denver spoke on the telephone many times and sent each other over 100 e-mails and letters concerning the condition of the property, various issues Denver had with the property, and the terms of the sale.

{¶5} On October 8, 2010, Denver sent Gregg an offer, which was prepared by Denver's attorney, to buy the property for a total price of $640,000. The offer was for the land and buildings only and did not include any business assets. $150,000 was to

be paid as a down payment, and the balance of $490,000 was to be owner-financed by SL & MB.

{¶6} In his second offer, dated August 11, 2010, Denver valued the land alone at $330,000, and the buildings at $310,000, for a total price of $640,000. No part of the price was attributed to any business assets.

{¶7} On July 14, 2011, Denver sent Gregg a third offer, which was only for the real estate and not any business assets, and the purchase price was still $640,000.

{¶8} Then, five days later, on July 19, 2011, Denver sent Greg a fourth offer, which still involved a purchase price of $640,000 for the land and buildings only. Like the other offers, it did not involve any business assets.

{¶9} Later in July 2011, Denver presented a fifth offer, which included a provision that if any third party asserted a claim against the farm while payments were still being made on the contract and SL & MB still owned the farm, Denver would be entitled to pay the claim and then deduct 200 percent of the amount he paid from the principal balance owed on the farm. So, for example, if a $10,000 claim was presented, Denver could pay it and then deduct $20,000 from the amount that he and Tracy still owed for the farm.

{¶10} Gregg testified he was uncomfortable with this provision because, around that time, he learned Denver had an extensive criminal history, which included grand theft, theft, perjury, and tampering with evidence. Denver was also convicted of felony impersonation of a police officer in 2006 in Cuyahoga County. As a result, Gregg became suspicious of Denver's motives in making this proposal and rejected it.

{¶11} Between August 23, 2011 and August 29, 2011, the parties signed two agreements that comprised the final version of their purchase contract. They consisted of: (1) a "Real Estate Purchase Agreement" and (2) an "Agreement for Purchase and Sale of Assets."

{¶12} The parties to these agreements were SL & MB; Patriot Partners, a partnership between Gregg and Amy; Oryann, a limited liability company Denver created to take title to the subject property; and Denver personally.

{¶13} According to the Real Estate Purchase Agreement, Oryann and Denver are the buyers, and agreed to pay $350,000 "for the land only" with $50,000 down. The balance was to be owner-financed with monthly installments of $10,000 to be paid to SL & MB.

{¶14} Pursuant to the Agreement for Purchase and Sale of Assets, Oryann and Denver agreed to pay Patriot Partners $290,000 for "all of the Seller's properties, assets, stock, and business as a going concern." These assets were to be listed in the attached Exhibit A, but that exhibit was left blank.

{¶15} Further, Oryann and Denver signed a "Note and Security Agreement" for $640,000, giving SL & MB a note for this amount and a security interest in Oryann LTD. to secure payment of the note. Oryann also signed a Mortgage in favor of SL & MB to secure the amount owed for the real property ($350,000). In addition, Oryann signed another Mortgage in favor of Patriot Partners on the real property to secure the amount owed under the asset purchase agreement.

{¶16} On October 20, 2011, the sale closed and the property transferred by deed to Oryann.

4

**{¶17}** After the closing, Oryann and Denver made the first 13 monthly payments ($130,000) pursuant to the terms of the parties' agreements, but they did not make the November 2012 payment or any subsequent payment.

**{¶18}** On November 20, 2012, Oryann filed a complaint against SL & MB and Amy personally. In Oryann's Second Amended Complaint, Oryann asserted two claims. In Count I, Oryann alleged the sellers defrauded it by concealing the following defects on the property: (1) water intrusion in the basement of the main house; (2) shifting foundation and some rotted floor joists in the cottage; (3) nonfunctional septic systems for the cottage and office building; (4) leaks in the barn roof; and (5) clogged or nonfunctional drain tiles. In Count II, Oryann alleged SL & MB breached the asset purchase agreement by failing to deliver the assets of the horse-boarding business to Oryann.

**{¶19}** SL & MB filed an answer and counterclaim, alleging Oryann breached the agreements by not making the agreed payments. SL & MB later joined Denver as a new-party defendant and filed a cross-claim against him, alleging he and Oryann jointly agreed, but failed, to make those payments.

**{¶20}** Denver filed an answer to SL & MB's cross-claim, denying its material allegations.

**{¶21}** The case was tried to the court. Following the trial, the trial court entered judgment, finding that Oryann failed to prove its fraud claim and that SL & MB failed to prove a meeting of the minds and the existence of consideration with respect to the asset purchase agreement. The court found that the real estate purchase agreement was enforceable and that Oryann and Denver unjustifiably stopped making payments

5

on it. The court granted judgment in favor of SL & MB with respect to the balance owed by Oryann and Denver under that contract in the amount of $170,000; dismissed SL & MB's counterclaim for $290,000 against Oryann and Denver on the asset purchase agreement; and dismissed Oryann's fraud claim against SL & MB and Amy.

**{¶22}** SL & MB and Amy appeal only that part of the trial court's judgment relating to the parties' asset purchase agreement, asserting the following for their sole assignment of error:

**{¶23}** "The trial court erred in holding that the Agreement for Purchase and Sale of Assets, and the promissory note and mortgage deed securing the obligations contained therein, are void and unenforceable on the grounds that there was no meeting of the minds between the parties with respect to the consideration to be given from sellers to buyers."

**{¶24}** "'A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, * * * consideration * * *, [and] a manifestation of mutual assent * * *.' *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D.Ohio 1976). A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991) * * *." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, ¶16. "'The existence of an enforceable contract is a prerequisite to a claim for breach of contract.'" *Spoerke v. Abruzzo*, 11th Dist. Lake No. 2013-L-093, 2014-Ohio-1362, ¶29, quoting *Ireton v. JTD Realty Invests., L.L.C.*, 12th Dist. Clermont No. CA2010-04-023, 2011-

Ohio-670, ¶38.  The existence of a contract is a question of law that we review de novo. *Spoerke, supra,* at ¶27.

**{¶25}** Further, our primary goal in interpreting a contract is to ascertain and give effect to the intent of the parties. *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999).  We presume the intent of the parties to a contract resides in the language used in the written instrument.  *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.  The interpretation of a contract is a question of law that we review de novo.  *Allstate Indemn. Co. v. Collister*, 11th Dist. Trumbull No. 2006-T-0112, 2007-Ohio-5201, ¶15.  Since the construction of a contract is a matter of law, this court will give no deference to the trial court's interpretation of the contracts involved herein. *Graham v. Drydock Coal Co.*, 76 Ohio St. 3d 311, 313 (1996).

**{¶26}** If contractual terms are unambiguous, a court may not interpret the contract in a manner inconsistent with the clear language of the instrument. *Shifren v. Forrest City Ents., Inc.*, 64 Ohio St.3d 635, 638 (1992). A court may consider parol or extrinsic evidence, however, to interpret a contract if its terms are ambiguous or unclear.  *Sugarhill Ltd. v. Brezo*, 11th Dist. Geauga No. 2004-G-2579, 2005-Ohio-1889, ¶35. Contractual terms are ambiguous if the terms are reasonably susceptible to more than one interpretation.  *Id.* at ¶33.  Such extrinsic evidence includes the circumstances surrounding the parties at the time the contract was made and the objectives they intended to accomplish by entering the contract.  *Career & Tech. Ass'n v. Auburn Voc. Sch. Dist. Bd. of Educ.*, 11th Dist. Lake No. 2013-L-010, 2014-Ohio-1572, ¶18.  Further, "it is a longstanding principle of contract law that when contract language is unclear, a court may look to the course of conduct between the parties as evidence of the

7

construction which they gave to the agreement." *Mentor Indus. Complex v. N. Coast Wood Prods.*, 11th Dist. Lake No. 2000-L-116, 2001 Ohio App. LEXIS 3290, *7 (Jul. 20, 2001). In addition, the parties' negotiations may be considered for the purpose of explaining ambiguous language in a contract. *Pharmacia Hepar, Inc. v. Franklin*, 111 Ohio App.3d 468, 475 (12th Dist.1996).

{¶27} The trial court construed the parties' contracts and found that the Real Estate Purchase Agreement was enforceable and that Oryann and Denver were jointly liable to SL & MB for the unpaid balance in the amount of $170,000.

{¶28} In contrast, the court found there was no meeting of the minds with respect to the asset purchase agreement and that it was illusory because it failed to identify with sufficient clarity the assets to which it applied. Alternatively, the court found there was no consideration given by SL & MB for that agreement. As a result, the court found that agreement was unenforceable.

{¶29} However, the express language of the two contracts demonstrates that both contracts were part of the same transaction and that the parties intended to be bound by both.

{¶30} "It is well settled that contracts must be read as a whole, and they must be interpreted in such a manner as to give effect to every provision*." Prudential Ins. Co. of Am. v. Corporate Circle, LTD*, 103 Ohio App.3d 93, 98 (8th Dist.1995), *appeal not allowed at* 73 Ohio St.3d 1453 (1995). "Moreover, as a general rule of construction, Ohio courts construe multiple documents together if they concern the same transaction." *Prudential, supra*, citing *Center Ridge Ganley, Inc. v. Stinn*, 31 Ohio St.3d 310 (1987); *accord Manufacturing Management Systems, Inc. v. Data Solutions, Inc.*,

11th Dist. Lake Nos. 11-074, 11-076, 1987 Ohio App. LEXIS 6173, *5-*6 (Mar. 20, 1987). "Thus, all writings that are a part of the same transaction should be interpreted together, and effect should be given to every provision of every writing." *Prudential, supra.*

{¶31} In *Prudential, supra,* the plaintiff/holder of the mortgage note sought judgment on the note and foreclosure of the mortgage. The debtor also signed an assignment of rentals, and the plaintiff also pursued a claim for the rentals. The note contained an "exculpation clause," which arguably limited the plaintiff to recovery on the note and mortgage. Thus, the debtor argued he was entitled to dismissal of the plaintiff's claim for recovery of the rentals. The trial court agreed with the debtor and dismissed the plaintiff's claim as to the rentals. The Eighth District reversed, holding:

> {¶32} The trial court's interpretation of the exculpation clause nullifies the * * * assignment of rentals and fails to interpret the loan documents together, giving effect to every provision of those writings. Under the interpretation made by the trial court * * *, the * * * assignment of rentals [is] rendered meaningless, as if [it was] never negotiated or signed.

{¶33} Turning to the facts of this case, the express language of the real estate purchase agreement and the asset purchase agreement demonstrate the parties' intent to treat both contracts as part of one transaction. This intent is shown by the fact that both agreements were entered contemporaneously by the parties and each contract referenced the other. In fact, each contract is dependent on the other. Specifically, the real estate purchase agreement provided: "*The purchase price herein shall first be applied against the * * * agreement for the purchase and sale of assets* attached hereto * * *." (Emphasis added.) Further, the asset purchase agreement provides that Oryann shall pay to Patriot Partners $290,000 for the assets of the business and that *"[t]he*

9

*purchase price shall be paid as part of the purchase price for the real estate*, a copy of such agreement is attached hereto * * *."  (Emphasis added.)

{¶34}  In addition, the extrinsic evidence supports our holding that the parties intended these two contracts to be part of the same transaction.  The farm was listed for sale at $1.2 million and the listing was for the real estate only; the listing did not include any business assets or items of personal property.

{¶35}  Further, during the parties' year-long negotiations, while Oryann presented several different versions of its offer to purchase the property, the total amount offered in each was always the same, $640,000.  Significantly, in the first five versions of its offer, Oryann offered $640,000 *for the real estate alone*, and did not attribute any part of the purchase price to business assets.  In the final version of Oryann's offer, for the first time, $290,000 of the $640,000 purchase price was attributed to the business assets.  However, according to Gregg's testimony, the assets were valued this way so Oryann would only have to pay real estate tax on the property valued at $350,000, rather than $640,000.  Thus, the valuation of the assets at $290,000 was solely for Oryann's tax benefit, and did not reflect the true value of the assets.

{¶36}  Based on the foregoing, the parties intended both contracts to be part of the same transaction and to be bound by both.  However, the trial court's construction of the contracts nullified the asset purchase agreement.  Moreover, the court failed to interpret the contracts together, giving effect to every provision of those writings. Under the interpretation made by the trial court, the foregoing contracts as a whole were rendered meaningless by only giving effect to the real estate purchase agreement and cancelling the asset purchase agreement, as if it was never negotiated and signed by

10

the parties. *Prudential, supra.* Perhaps the best indication that the trial court's construction of the contracts did not reflect the parties' intent was that, under this construction, Oryann and Denver would end up paying only about one-half of the price the parties had always agreed would be the purchase price for the farm. The trial court thus erred in cancelling the asset purchase agreement.

{¶37} In addition, contrary to the trial court's findings, there was a meeting of the minds regarding the consideration given by Patriot Partners to Oryann for the asset purchase agreement.

{¶38} "[A] contract is not binding unless supported by consideration." *Williams v. Ormsby*, 131 Ohio St.3d 427, 2012-Ohio-690, ¶15. "Consideration * * * is a 'bargained for' legal benefit and/or detriment." *Prendergast v. Snoeberger*, 154 Ohio App.3d 162, 2003-Ohio-4742, ¶28 (7th Dist.), citing *Kostelnik, supra,* at ¶16. "A benefit may consist of some right, interest, or profit accruing to the promisor, while a detriment may consist of some * * * loss * * * undertaken by the promisee." *Williams, supra.* In other words, in order for there to be consideration, the promisor (the party binding himself to perform) must receive some benefit, and/or the promisee (the party receiving the benefit of the promisor's performance) must sustain some detriment. Further, the existence of consideration is a question of law, which we review de novo. *Orwell Natural Gas Co. v. Fredon Corp.*, 11th Dist. Lake No. 2014-L-026, 2015-Ohio-1212, ¶37.

{¶39} The express language of the asset purchase agreement reflects the parties' meeting of the minds regarding the consideration given by Patriot Partners. The asset purchase agreement provided: "the Purchaser [Oryann and Denver] agree[ ] to purchase from the Seller [Patriot Partners], and the Seller agrees to sell and deliver to

11

the Purchaser on the Closing Date, all of the Seller's properties, assets, stock, and business as a going concern." While Exhibit A to that agreement, which was supposed to list the assets to be conveyed to Oryann, was not filled out by the parties, Oryann and Denver signed the contract as written, indicating that the contract was sufficiently specific for their purposes. Their understanding was that they were to receive all of Patriot Partners' business assets as consideration, and the contract set forth this understanding.

{¶40} Further, the extrinsic evidence supports our holding that the parties had a meeting of the minds regarding consideration. After Oryann and Denver signed this contract, they took possession of the farm and made regular payments in the amount of $10,000 per month *for 13 months*, without objecting to any lack of specificity in the contract.

{¶41} Moreover, Amy testified regarding the assets Patriot Partner's delivered to Oryann in connection with this transaction. In her testimony, she referred to a list of these assets that was provided by SL & MB to Oryann in discovery. Amy confirmed at trial that Patriot Partners delivered its business assets to Oryann, including the following: (1) "horse jumps including rails and standards;" (2) "four propane fueled heaters," which were left in the pole building; (3) "tractor equipment - back blade, plow blade and a brush hog," which were left in the outbuildings; (4) eight portable window air conditioners, (5) 25 four foot by six foot rubber horse stall mats; (6) three 1,000-gallon and two 300-gallon propane tanks; and (7) numerous lamps and free-standing light fixtures.

**{¶42}** Thus, as a matter of law, there was a meeting of the minds regarding consideration and consideration was given by Patriot Partners in exchange for the asset purchase agreement. As a result, that agreement is enforceable, and the trial court erred in concluding otherwise. Consequently, the trial court also erred in finding the "Note and Security Agreement" unenforceable (because it secured the asset purchase agreement) and in finding the Mortgage securing the asset purchase agreement unenforceable. On remand, the trial court shall take all steps necessary to reinstate those instruments, which shall remain in full force in effect.

**{¶43}** SL & MB's assignment of error is sustained.

**{¶44}** For Oryann's sole cross-assignment of error, it contends:

**{¶45}** "The trial court committed error in determining that Oryann did not rely on misrepresentations or concealment in the purchase of real estate and that each of the material defects was open and obvious."

**{¶46}** In order for Oryann to prevail on its claim for fraudulent misrepresentation or concealment, it was required to prove: (1) there were defects on the property; (2) which were material to the transaction; (3) Amy and/or Greg misrepresented or actually concealed those defects; (4) with knowledge of the defects they misrepresented or concealed; (5) with the intent of inducing Oryann's reliance; (6) Oryann actually relied on those misrepresentations or concealment, (6) its reliance was reasonable; and (7) Oryann sustained damages as a result of its reliance. *Doctor v. Marucci*, 11th Dist. Lake No. 2013-L-056, 2013-Ohio-5831, ¶11-12; *Thaler v. Zovko*, 11th Dist. Lake No. 2008-L-091, 2008-Ohio-6881, ¶39.

13

**{¶47}** "The elements of fraud must be established by clear and convincing evidence. Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established." *Rapport v. Kochovski*, 185 Ohio App.3d 309, 2009-Ohio-6880, ¶15 (5th Dist.), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954). "The burden to prove fraud rests upon the party alleging the fraud." *Id.*

**{¶48}** "The doctrine of caveat emptor, although virtually abolished in the area of personal property, remains a viable rule of law in real estate sales." *Layman v. Binns*, 35 Ohio St.3d 176, 177 (1988). "'The principle of caveat emptor applies to sales of real estate relative to conditions open to observation. Where those conditions are discoverable and the purchaser has the opportunity for investigation and determination without concealment or hindrance by the vendor, the purchaser has no just cause for complaint even though there are misstatements and misrepresentations by the vendor not so reprehensible in nature as to constitute fraud. * * *'" *Id.*, quoting *Traverse v. Long*, 165 Ohio St. 249, 252 (1956).

**{¶49}** Caveat emptor precludes recovery in an action by a purchaser for a defect in real estate when (1) the defect complained of is open to observation or discoverable on reasonable inspection, (2) the purchaser had an unimpeded opportunity to examine the property, and (3) there is no fraud on the part of the vendor. *Bencivenni v. Dietz*, 11th Dist. Lake No. 2012-L-127, 2013-Ohio-4549, ¶45.

**{¶50}** Oryann argues the trial court's finding that it failed to present credible evidence regarding most of the elements of its fraud claim is against the manifest

14

weight of the evidence. The parties presented conflicting evidence on each of the elements of fraud, and the trial court made findings of fact regarding each element.

{¶51} First, the court found that, although Oryann proved there were defects in the property, it failed to prove that the defects were material to the transaction. In the context of a claim for fraud, a misrepresentation of fact is material when, under the circumstances, it would likely affect the conduct of a reasonable person in deciding whether to enter into the transaction at issue. *Brannon v. Mueller Realty & Notaries*, 1st Dist. Hamilton No. C-830876, 1984 Ohio App. LEXIS 11140 (Oct. 24, 1984). The trial court found that Tracy was the managing member of Oryann and had the sole authority to accept or reject a contract on Oryann's behalf. The court also found that Tracy did not testify that she would have declined to purchase the property on the stated terms if she had known more about the defects. The court found that, although Denver negotiated the transaction on behalf of Oryann, there was no evidence that he had the authority to accept or reject the contract on Oryann's behalf. Significantly, Oryann does not challenge this finding on appeal.

{¶52} Second, the court found that Oryann failed to prove that SL & MB misrepresented or concealed any allegedly material defect. The court found that there was no evidence Gregg knew anything more than Denver told him about the defects, since there was no evidence Gregg observed them or learned about them from any other source. The trial court noted that, instead of denying that there was any water intrusion in the basement or any septic system malfunction, Gregg sent to Denver a "Residential Property Disclosure form," which confirmed the existence of these problems. Gregg faxed this completed form to Denver on August 2, 2011, before the

contracts were signed. Under the heading "Water Intrusion," Gregg stated there is water in the basement from this year's heavy rain and also from condensation of the water lines. Thus, rather than concealing this condition, Gregg confirmed there was water in the basement.

{¶53} With respect to the drain tiles, Gregg testified he had them professionally cleaned in October 2010, one year before the contracts were signed.

{¶54} With respect to the septic systems, Gregg said that they were functioning properly; that he did routine maintenance on them throughout the years he and Amy owned the property; and that he periodically had the tanks pumped.

{¶55} Moreover, Gregg was living in South Carolina during the parties' negotiations, and retained contractors in Ohio to address some of Denver's complaints. Gregg relied on these contractors to make repairs to the property, including the drain tiles, barn roof repair, and cottage foundation repair.

{¶56} The court found that the only alleged representation by Amy relating to basement water was that she attributed it to condensation or a temporary break in a basement drain connection. Denver testified the downspouts were removed from the drain tile and the inlets to the drain tiles were covered, showing the sellers obviously meant to conceal that there was water in the basement. However, Amy testified she diverted the downspout flow by attaching pieces of black flexible piping to the bottom of the downspouts and led them away from the house and covered the inlets with tape to reduce ground water pressure during heavy rains. She said she had good reason to believe her corrective efforts were readily observable. While Denver testified the plastic piping and covered inlets were concealed by ground cover, the photographs introduced

at trial contradicted his testimony and showed that Amy's corrective efforts were open and obvious and not hidden. After this was pointed out on cross-examination, Denver admitted that he saw the downspout extensions during his visits to the property. Significantly, Gregg testified there are no public storm sewers to tie into along Billings Road, and residents are not allowed to attach their downspouts to the drain. Rather, they are required to attach piping to the end of the downspouts to allow water to be directed away from the house and drain onto the ground. He said this is how rain water has been diverted on the property since the home was built in the 1960s. The court found that there was no credible evidence that Amy knew about any of the other alleged material defects or that she made any effort to conceal any defect.

{¶57} Third, the court found that Oryann failed to prove it relied on any misrepresentation or concealment of any allegedly material defect. The court referenced the evidence that for over one year before signing the contracts, Denver aggressively investigated the property's condition and declined to rely on any representation. He repeatedly complained about defects he perceived on the property and Gregg's efforts to correct them. The court found Denver and Tracy had possession of the property for two months before the closing and in that period, Denver had employees from Tracy's other companies explore and correct most of the alleged material defects on the property before Oryann participated in the closing and accepted the title transfer.

{¶58} In addition, the court noted that a paragraph in the Real Estate Purchase Agreement, entitled "CONDITION OF PROPERTY – INSPECTION, provided:

{¶59} The * * * Buyer has already inspected the property and accepts it in its present condition. The Seller has made no promises concerning

17

the land and is selling the land as is with no condition or promises being made. The buyer accepts the property in this as is condition and expects nothing further from the Seller than clear title."

**{¶60}** Before completing the sale, Oryann required SL & MB to modify this provision in the Real Estate Purchase Agreement with an addendum to warrant that the well, well pipes and drain tile are functional and not leaking at the time of sale and that the barn roof is not leaking at the time of the sale. The court found that these warranties evidenced Oryann's awareness of these issues and thus belie its alleged reliance on any misrepresentation or concealment of those conditions.

**{¶61}** Fourth, the court found that each of the allegedly material defects was open and obvious or discoverable by a reasonable inspection and that any reliance by Oryann on any alleged misrepresentation or concealment of Gregg or Amy was not reasonable. In support of this finding, the court noted that both Barrys had unrestricted access to the property and unrestrained opportunities to inspect the property themselves or to retain any more knowledgeable inspector before Oryann agreed to purchase the property. Denver admitted he personally inspected the property on his own at least four times. He also admitted that he never hired an inspector to perform a standard inspection and that Gregg did nothing to hinder him from hiring an inspector. Denver was thus free to have the property inspected by the inspector(s) of his choosing, but simply chose not to. Denver said he was not required to obtain an inspection because Gregg had answered his questions. However, because Denver was on notice of potential problems with the property, he was *not* justified in relying on any representations of the sellers and was on notice of the need for further inspection.

18

*Niermeyer v. Cook's Termite & Pest Control, Inc.*, 10th Dist. Franklin No. 05AP-21, 2006-Ohio-640, ¶26.

**{¶62}** Fifth, the trial court found that Oryann failed to prove the reasonable amount of any damage resulting from any specific defect on the property. Damages caused by fraud are measured by the resulting reduction of the value of the property below the purchase price or the reasonable cost to repair those defects. *Northpoint Props. v. Charter One Bank,* 8th Dist. Cuyahoga No. 94020, 2011-Ohio-2512, ¶30. The court found that Oryann presented no evidence that the defects reduced the fair value of the property below the purchase price or any evidence showing the reasonable cost to repair any alleged defect. Instead, Oryann relied solely on cancelled checks written by unidentified individuals apparently on behalf of two unrelated companies, which Tracy owned, to pay various unidentified individuals and companies for purposes that were not described on the checks or by any testimony. Denver said he did not hire any contractors to perform work in order to save money, but Oryann presented no witnesses to testify regarding the reasonable cost to repair any alleged defects. Nor did Oryann present any bills, invoices, or statements for any repairs. Thus, none of the checks were supported by corresponding invoices from contractors to show that any of the checks were issued to pay workers for any labor or materials provided to the property. As a result, the court found no reliable evidence was presented that any of the checks offered at trial had anything to do with this case.

**{¶63}** In determining witness credibility, the court was entitled to consider the frank and direct nature of Gregg and Amy's testimony; that Denver's testimony was often based on speculation and assumptions rather than facts; and that Denver was

19

convicted of felony impersonation of a police officer in 2006 in Cuyahoga County. Based on our review of the record, the trial court did not err in making its findings as to each element of fraud as each was supported by competent, credible evidence.

{¶64} Oryann's cross-assignment of error is overruled.

{¶65} For the reasons stated in this opinion, it is the order and judgment of this court that the judgment of the Lake County Court of Common Pleas is affirmed in part and reversed in part, and this case is remanded for further proceedings consistent with this opinion.


COLLEEN MARY O'TOOLE, J., concurs,

THOMAS R. WRIGHT, J., concurs in judgment only.