[Cite as *Calypso Asset Mgt., L.L.C. v. 180 Indus., L.L.C.*, 2019-Ohio-2.]

# IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Calypso Asset Management, LLC et al., | : | |
| Plaintiffs-Appellees, | : | |
| | : | No. 18AP-53 |
| v. | : | (C.P.C. No. 15CV-4446) |
| 180 Industrial, LLC, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

# D E C I S I O N

## Rendered on December 31, 2018

**On brief:** *Brunner Quinn, Rick L. Brunner,* and *Patrick M. Quinn,* for appellees. **Argued:** *Patrick M. Quinn.*

**On brief:** *Carpenter Lipps & Leland LLP,* and *David A. Wallace,* for appellant. **Argued:** *David A. Wallace.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, 180 Industrial, LLC ("180"), appeals a judgment of the Franklin County Court of Common Pleas that (1) awarded 180 attorney fees and costs under a fee-shifting provision in 180's contract with plaintiff-appellee, Calypso Asset Management, LLC ("CAM"), and (2) denied 180's motion for sanctions under R.C. 2323.51. For the following reasons, we reverse and remand this matter to the trial court.

{¶ 2} This case arises from a failed business transaction between 180 and CAM. CAM intended to purchase Calypso Distribution Services, Ltd. ("Calypso"), a logistics company, and the industrial facility that Calypso used to operate its business.[1] In a

---

[1] Throughout this decision, we will refer to Calypso's industrial facility as the "Innis Road property."

simultaneous transaction, CAM planned to enter into a sale-leaseback arrangement with a third party. In this arrangement, CAM would sell the Innis Road property to the third party and enter into a long-term lease for the property. CAM needed the money from the sale of the Innis Road property to fund its purchase of Calypso and the property itself.

{¶ 3} After entering into a letter of intent with Calypso, CAM hired plaintiff-appellee, Alterra Real Estate Advisors, LLC ("Alterra"), to market the Innis Road property. Pursuant to the listing agreement between Alterra and CAM, Alterra would receive a commission of four to six percent of the gross sale price upon the closing of the sale-leaseback transaction.

{¶ 4} In June 2014, 180 expressed interest in the Innis Road property. Bryan Norton, 180's chief operating officer, met with Jim Pack, CAM's chief executive officer and president, in July 2014. During that meeting, Pack told Norton that he intended to integrate Calypso with his trucking company and invest at least one million dollars in the combined businesses. Impressed with Pack's pitch, Norton and his partner, Mark Weber, decided to do business with Pack.

{¶ 5} On July 25, 2014, 180 and CAM entered into a purchase agreement whereby 180 agreed to pay $8.5 million to purchase the Innis Road property. The agreement also provided that 180 would lease the property back to CAM. In accordance with the agreement's terms, 180 deposited $170,000 with an escrow agent.

{¶ 6} Section 3 of the purchase agreement mandated a due-diligence period in which 180 could conduct "any and all feasibility studies, inspections, and all other tests, studies or analysis, which in [180's] sole discretion, it determine[d] [was] necessary in order to determine the feasibility of the transaction." (Ex. 1, Norton Dep.) If 180 "determine[d] in its sole discretion that the [Innis Road property] [was] not appropriate for its use in accordance with its intentions or if [180 was] unsatisfied for any reason with the results of any such inspections, tests, studies or analysis," 180 could terminate the purchase agreement. *Id.* Upon termination of the purchase agreement, the purchase agreement would be "deemed null and void," none of the parties would have any further obligations to any other party or any third party, and the escrow agent was required to return 180's deposit to 180. *Id.*

{¶ 7} After conducting its initial due diligence, 180 sent CAM a letter, dated September 25, 2014, identifying the contingencies that CAM had to satisfy for the deal to close. In relevant part, the letter stated:

> As we have previously discussed and agreed, [180's] Purchase of the [Innis Road property] is contingent on a revision to the Purchase Agreement and Lease that reflects [CAM's] commitment of one million dollars ($1,000,000.00) as an additional security deposit for [CAM's] performance of the Lease.
>
> Further, pursuant to Paragraph 3 of the Purchase Agreement, [180] requests that the following repairs and issues be addressed before closing:
>
> - Repair and replacement of the asphalt pavement;
>
> - Repair and replacement of the concrete pavement;
>
> - Recompacting of the gravel lot;
>
> - Removal of the inactive generator;
>
> - Repair and replacement of the building façade;
>
> - Repair and [r]eplacement of the roof;
>
> - Repair and replacement of broken bathroom fixtures, including: toilets, urinals, and sinks;
>
> - Repair and replacement of flooring materials to address holes or other safety hazards;
>
> - Removal of the two abandoned boilers * * *;
>
> - Possible replacement of current warehouse lights with new energy efficient fixtures.

(Ex. 2, Norton Dep.) While CAM agreed to address some of these issues, it did not agree to address others.

{¶ 8} In the meantime, 180 was encountering difficulty obtaining financing to purchase the Innis Road property. In an email to Pack dated November 18, 2014, 180 attempted to restructure the terms of the parties' deal. 180 explained that almost all lenders

and financiers it had approached had flatly rejected the deal "once they analyze[d] the earnings of the tenant as well as the comps and other characteristics of the building." (Ex. 3, Norton Dep.) 180 then set forth a broad proposal incorporating new terms for the sale-leaseback transaction.

{¶ 9} In conversations discussing the restructuring, Norton learned for the first time that Pack did not have one million dollars to invest in the prospective post-purchase company. Norton's partner, Weber, became angry when Norton told him that Pack did not have the promised investment funds. To 180, the million-dollar investment was a key aspect of the sale-leaseback transaction because that investment would secure the new company's sustainability, and consequently, ensure the company's ability to pay rent on the Innis Road property. Norton told Pack that 180 had wasted "a very significant amount of time and money on [the] acquisition" of the Innis Road property and Weber had "given some serious consideration to suing [CAM] based on the way [Pack] ha[d] behaved in [the] transaction." (Norton Dep. at 43.)

{¶ 10} Ultimately, CAM rejected 180's proposed restructuring of the transaction.[2] At that point, the deal fell apart. Norton then asked Pack to release 180's $170,000 deposit so the escrow agent could return the deposit to 180. Pack responded, "[O]kay[,] [i]f you want us to release the escrow [deposit], then * * * we need a release because you previously threatened to sue us." (Apr. 6, 2017 Tr. at 64.)

{¶ 11} On December 23, 2014, 180 and CAM entered into a contract entitled "Settlement Agreement and Release of Claims." In that agreement, both parties agreed to release and discharge the other from any claims arising from or related to the purchase agreement or the Innis Road property. In relevant part, the recitals set forth in the agreement provided:

> This Agreement is entered into with reference to the following facts:
>
> A. [CAM] entered into an agreement with * * * the current owner of the real property commonly known as 2035 Innis Road, Columbus, Ohio, 43224 (the "Property") to acquire the

---

[2] According to Pack, Norton did not mention suing CAM until CAM refused 180's proposal to restructure the transaction. Pack testified that, after he rejected the proposal, he "got a call from Mr. Norton indicating that Mr. Weber was * * * contemplat[ing] suing us to * * * compel us to go along with his new revised plan." (Apr. 6, 2017 Tr. at 62-63.)

Property in conjunction with [CAM's] acquisition of the Calypso Logistics operating company;

B. On or about July 25, 2014, [CAM] entered into a Purchase Agreement with 180 Industrial (the "Purchase Agreement") to sell the Property and all of the associated right, title and interest in and to all buildings and other improvements on or within the Property to 180 Industrial;

C. Consistent with the Purchase Agreement, 180 Industrial completed its due diligence on [CAM] and the Property and determined that it could not proceed to close under the terms set forth in the Purchase Agreement;

D. On or about November 18, 2014, 180 Industrial sent [CAM] an email proposal setting forth new terms under which 180 Industrial would close on its acquisition of the Property;

E. The Parties were unable to reach agreement on revised terms and the Parties agreed to terminate the Purchase Agreement * * *[.]

(Ex. 5, Norton Dep.)

{¶ 12} Additionally, the settlement agreement and release contained a fee-shifting provision. Section M of the agreement stated:

If any action is brought to enforce this Agreement, or is brought in connection with any dispute arising out of this Agreement or the claims that are the subject of this Agreement, the prevailing Party shall be entitled to recover damages, attorney's fees, and other costs incurred in such litigation that they may prove are the direct and proximate result of any breach, in addition to any other relief which that Party may be entitled to by law or in equity.

*Id.*

{¶ 13} After the parties executed the settlement agreement and release, Norton informed Jason Sipos, Calypso's president, that the purchase agreement between it and CAM had terminated. Sipos asked whether Norton would be interested in entering a sale-leaseback transaction directly with Calypso. This conversation led to Calypso and Triple

Net Acquisitions, LLC ("Triple Net") executing a purchase agreement.[3]   Under that agreement, Triple Net would purchase the Innis Road property for $3.5 million and Calypso would enter into a long-term, triple-net lease with Triple Net.

{¶ 14} Pack discovered that Calypso was pursuing a sale-leaseback transaction with Triple Net in March 2015.  Pack believed that "180 had went to Calypso [ ] directly and it reformed this deal and cut us out of it."  (Apr. 6, 2017 Tr. at 140.)

{¶ 15} On May 26, 2015, CAM and Alterra filed suit against 180.[4]  In the complaint, CAM contended that the settlement agreement and release was void and/or voidable because it resulted from fraud in the inducement, and CAM sought a declaratory judgment to that effect.  CAM also asserted a claim for fraud and, with Alterra, claims for breach of contract and tortious interference with a business and contractual relationship.

{¶ 16} In essence, plaintiffs maintained that 180 misrepresented its reasons for terminating the purchase agreement.  According to plaintiffs, 180 lied when it told CAM that it could not purchase the Innis Road property under the original contractual terms and when it proposed revised terms for the purchase.  Plaintiffs contended that these alleged misrepresentations were a sham that 180 devised to trigger the demise of the parties' deal so 180 could contract directly with Calypso.

{¶ 17} Approximately two months after plaintiffs filed the complaint, 180 moved for summary judgment.  Plaintiffs responded with a Civ.R. 56(F) motion that requested a time extension in order to conduct discovery.  In an entry dated September 9, 2015, the trial court granted plaintiffs 60 days to pursue discovery into whether 180 fraudulently induced the execution of the settlement agreement and release.  Plaintiffs used this additional time to complete written discovery and take Norton's deposition.  Using this discovery, plaintiffs opposed the motion for summary judgment in a memorandum filed December 8, 2015.

{¶ 18} On March 29, 2016, the trial court issued a decision granting 180's motion for summary judgment.  In short, the trial court found that 180 had not induced CAM to enter the settlement agreement and release.  The trial court stated:

---

[3]  The record contains no evidence explaining the exact relationship between 180 and Triple Net.  However, they appear to share some affiliation as Norton is chief operating officer of both entities.

[4]  Plaintiffs also named Calypso as a defendant, but they later voluntarily dismissed their claims against Calypso.

[CAM] requested the release and was not "induced" into it. The Court acknowledges [CAM] did so because it was unaware that 180 Industrial and Calypso were allegedly improperly acting in concert to close it out of the deal, but [CAM] has not shown how 180 Industrial's purported improper conduct induced it into seeking a mutual release of claims. Again, 180 Industrial was only seeking to terminate the purchase contract; [CAM] demanded that the parties enter into a release agreement.

Even construing the evidence in a light most favorable to [CAM], any fraudulent conduct was committed in connection with the real estate purchase contract, not with the execution of the release agreement. There are insufficient circumstances from which reasonable minds could conclude that 180 Industrial somehow induced Plaintiff into asking for a release. Therefore, the Court finds, as a matter of law, that the release is not void for fraudulent inducement.

(Mar. 29, 2016 Decision and Entry at 13-14.)

{¶ 19} Because the release was valid and enforceable, the trial court found that it barred CAM from asserting its claims against 180, and 180 was entitled to judgment on those claims as a matter of law. The trial court also ruled that 180 was entitled to summary judgment on Alterra's claims because Alterra had no contractual relationship with 180 or Calypso. Finally, the trial court found that 180 could move for an award of attorney fees and costs under the fee-shifting provision in the settlement agreement and release because 180 was the prevailing party in the instant action.

{¶ 20} 180 then moved for an award of attorney fees and costs totaling $50,563.05. 180 supported its request with its attorneys' affidavits, copies of billing records, and an expert affidavit testifying to the reasonableness of the attorney fees sought. Immediately prior to the hearing on the motion for attorney fees and costs, 180 filed supplemental affidavits setting forth additional attorney fees and costs. In total, 180 sought $70,588.27 in attorney fees and costs.

{¶ 21} At the fees hearing, CAM presented the testimony of its own expert witness, who opined that the reasonable amount of fees due 180's attorneys was only $25,000. In an entry dated November 17, 2016, the trial court ordered CAM to pay $30,599.44, which consisted of $28,500 in attorney fees, $1,500 in expert expenses, and $559.44 in litigation expenses.

{¶ 22} While 180 was pursuing an award under the fee-shifting provision of the settlement agreement and release, it also moved for sanctions against CAM, Alterra, and their attorneys under R.C. 2323.51. 180 argued that: (1) CAM's assertion of fraudulent inducement and Alterra's claims for breach of contract and tortious interference were not warranted under existing law or a good faith argument for a change in the law, (2) plaintiffs made false statements in their complaint and memorandum in opposition to summary judgment, and (3) plaintiffs' counsel concealed Pack's presence at Norton's videoconference deposition. 180 contended that all this conduct was frivolous under R.C. 2323.51(A)(2)(a) and justified an award of reasonable attorney fees and costs. Additionally, in conjunction with its motion for sanctions, 180 filed a motion seeking leave to conduct discovery to obtain additional evidence regarding plaintiffs' alleged frivolous conduct.

{¶ 23} In a decision and entry dated July 14, 2016, the trial court set a hearing date for 180's motion for sanctions and denied 180's motion for leave to conduct discovery. The sanctions hearing ultimately occurred before a magistrate. Prior to that hearing, the magistrate limited the time for the hearing to three hours, thus giving each side one and one-half hours in which to present its case. Both Pack and Norton testified at the hearing.

{¶ 24} On December 4, 2017, the magistrate issued a decision finding that neither plaintiffs nor their counsel engaged in frivolous conduct. Consequently, the magistrate recommended that the trial court deny 180's motion for sanctions. 180 objected to the magistrate's decision. In a decision and entry dated January 10, 2018, the trial court overruled 180's objections and adopted the magistrate's decision.

{¶ 25} 180 now appeals the January 10, 2018 judgment, and it assigns the following errors:

> [1.] THE TRIAL COURT ABUSED ITS DISCRETION IN ITS AWARD OF ATTORNEYS' FEES AND COSTS BECAUSE IT DID NOT DETERMINE A REASONABLE NUMBER OF HOURS OR A REASONABLE HOURLY RATE, DID NOT FOLLOW ITS OWN FLAWED METHODOLOGY, AND AWARDED AN AMOUNT OF FEES AND COSTS THAT WAS SO UNREASONABLY LOW THAT IT SHOCKS THE CONSCIENCE.
>
> [2.] THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING DEFENDANT/APPELLANT'S MOTION FOR SANCTIONS PURSUANT TO R.C. 2323.51(A)(2)(a)(i)-(iv) BY

NOT FINDING PLAINTIFFS' ACTIONS WERE FRIVOLOUS IN LIGHT OF EXISTING LAW.

[3.] THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING DEFENDANT/APPELLANT'S REQUESTS FOR DISCOVERY AND ITS MOTION FOR SANCTIONS PURSUANT TO R.C. 2323.51(A)(2)(a)(i)-(iv) [and in] MAKING RULINGS ON FACTUAL ISSUES WHICH WERE AGAINST SOUND, REASONABLE, AND LEGAL DECISIONMAKING.

{¶ 26} By its first assignment of error, 180 initially argues that the trial court erred in not using the lodestar method to calculate the amount of reasonable attorney fees owed 180 under the fee-shifting provision of the settlement agreement and release. We agree.

{¶ 27} Generally, Ohio follows the "American Rule," which precludes a prevailing party in a civil action from recovering attorney fees as a part of the costs of litigation. *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, ¶ 7. However, in one of the exceptions to that rule, a trial court may award attorney fees where an enforceable contract specifically provides for the losing party to pay the prevailing party's attorney fees. *Id.* In such an instance, "agreements to pay another's attorney fees are generally 'enforceable and not void as against public policy so long as the fees awarded are fair, just and reasonable as determined by the trial court upon full consideration of all the circumstances of the case.' " *Id.* at ¶ 8, quoting *Nottingdale Homeowners' Assn. v. Darby*, 33 Ohio St.3d 32 (1987), syllabus.

{¶ 28} In determining the amount of reasonable attorney fees to award, courts generally apply the lodestar method. *Trumbull Twp. Bd. of Trustees v. Rickard*, 11th Dist. No. 2016-A-0061, 2017-Ohio-6945, ¶ 28 (holding that the lodestar method "governs trial court procedure when an exception to the general rule authorizes an award of attorney fees"); *BIGResearch, LLC v. PENN, LLC*, 10th Dist. No. 11AP-855, 2012-Ohio-2992, ¶ 52 ("It is true that, in a civil action in an Ohio court of law, an award of attorney fees is dependent upon the completion of prescribed procedures and analyses, e.g., a lodestar analysis."). Under that method, a trial court first multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 145 (1991). The trial court may then modify that amount by application

of the reasonableness factors listed in Prof.Cond.R. 1.5(a).  *Id.* (applying the predecessor to Prof.Cond.R. 1.5(a)).  Those factors include:

> (1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2)  the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3)  the fee customarily charged in the locality for similar legal services;
>
> (4)  the amount involved and results obtained;
>
> (5)  the time limitations imposed by the client or by the circumstances;
>
> (6)  the nature and length of the professional relationship with the client;
>
> (7)  the experience, reputation, and ability of the lawyer performing the services; [and]
>
> (8)  whether the fee is fixed or contingent.

Prof.Cond.R. 1.5(a)(1) through (8).  The trial court has the discretion to determine which factors to apply and in what manner the factors will affect the amount of fees awarded. *Bittner* at 146.

{¶ 29}  Although the trial court exercises broad discretion in applying the lodestar method, it must state the basis for the fee determination.  *Id.*; *Timoneri v. NorthSteppe Realty, Inc.*, 10th Dist. No. 15AP-618, 2016-Ohio-5901, ¶ 55; *Pack v. Hilock Auto Sales*, 10th Dist. No. 12AP-48, 2012-Ohio-4076, ¶ 16.  Typically, without an explanation of the trial court's calculations and reasoning, an appellate court cannot meaningfully review the fee determination.  *Bittner* at 146; *Pack* at ¶ 16; *TCF Natl. Bank v. Cunningham*, 5th Dist. No. 2009 CA 00159, 2010-Ohio-1032, ¶ 8.  If a trial court's decision awarding reasonable attorney fees lacks sufficient explanation, an appellate court will reverse the award and remand the matter for the trial court to further elucidate its analysis.  *O'Neill v. Tanoukhi*, 7th Dist. No. 10-MA-45, 2011-Ohio-2626, ¶ 20; *Jubilee Ltd. Partnership v. Hosp.*

*Properties, Inc.*, 10th Dist. No. 09AP-1145, 2010-Ohio-5550, ¶ 52; *Foland v. Englewood*, 2d Dist. No. 22940, 2010-Ohio-1905, ¶ 83-84; *Cunningham* at ¶ 9-10; *Turner v. Progressive Corp.*, 140 Ohio App.3d 112, 116-17 (8th Dist.2000).

{¶ 30} Here, at the conclusion of the fees hearing, the trial court recognized that it needed to apply the lodestar method to determine the amount of reasonable attorney fees owed to 180. However, the trial court did not perform the first step of the lodestar method, i.e., multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. The trial court, instead, generally addressed many of the Prof.Cond.R. 1.5(a) factors and then summarily concluded, "as a round number it's going to be $30,000 that I find is reasonable, including the expert and costs."[5] (Sept. 1, 2016 Tr. at 56.) Although the trial court later reconsidered its initial ruling in a decision dated January 18, 2017, that decision does not further illuminate the trial court's fee analysis.

{¶ 31} Moreover, we cannot adduce from the evidence how a calculation of reasonable attorney fees using the lodestar method would result in an award of $30,000. As we stated above, 180 provided the trial court with invoices totaling $70,588.27. Plaintiffs presented an expert witness to contradict that evidence, but the expert did not opine regarding the total number of hours reasonably expended on the litigation or reasonable hourly rates for the attorneys who worked those hours. While the expert testified about reasons to reduce the hours billed, he did not quantify the exact number of hours to cut. Given the expert's failure to supply basic information necessary for calculating reasonable attorney fees using the lodestar method, his testimony provides no insight.

{¶ 32} Consequently, in the final analysis, we conclude that the trial court's approach to determining reasonable attorney fees precludes any meaningful appellate review. We thus sustain 180's first assignment of error to the extent that it advances error in the application of the lodestar method.

{¶ 33} Our ruling on the first part of 180's first assignment of error moots the remaining two arguments contained within the assignment. We, therefore, will not address whether the trial court inconsistently applied its own methodology or whether the amount of attorney fees and costs awarded was so unreasonably low that it shocks the conscience.

---

[5] In response to questions seeking clarification of its ruling, the trial court allowed 180 to recover "hard costs" such as filing fees and the cost of a copy of Norton's deposition transcript. (Sept. 1, 2016 Tr. at 58.) The addition of these costs increased the amount awarded to 180 by $559.44.

{¶ 34} Because 180's second and third assignments of error both address rulings related to the motion for sanctions, we will discuss those two assignments of error together. We will begin our review with 180's argument that the trial court erred in denying it leave to conduct discovery into plaintiffs' and their attorneys' alleged frivolous conduct. We find that argument unpersuasive.

{¶ 35} Appellate courts review decisions on matters relating to discovery under an abuse-of-discretion standard. *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 592 (1996). An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 36} Ohio case law addressing the propriety of discovery to support the imposition of sanctions is scant. Thus, Ohio courts have drawn on federal precedent reviewing decisions to grant or deny discovery in the context of Fed.R.Civ.P. 11 proceedings. Those courts have concluded that a trial court must, to the extent possible, limit the scope of sanction proceedings to the record, and only allow discovery in extraordinary circumstances. *Marconi v. Savage*, 8th Dist. No. 102619, 2016-Ohio-289, ¶ 45; *Holloway v. Holloway Sportswear, Inc.*, 3d Dist. No. 17-11-24, 2012-Ohio-2135, ¶ 29. Such an approach prevents collateral proceedings on sanctions from expanding into full blown litigation. *Marconi* at ¶ 46; *Holloway* at ¶ 29. We find this approach sensible, and we will follow it in this case.

{¶ 37} 180 argues that this case involves extraordinary circumstances that warranted discovery because 180 did not know how much investigation plaintiffs' attorneys had undertaken prior to filing the complaint. This lack of knowledge is typical, not extraordinary. Accordingly, we conclude that the trial court did not err in denying 180 leave to conduct discovery.

{¶ 38} Next, 180 argues that the trial court erred in overruling its objection to the magistrate's ruling limiting the length of the sanctions hearing to three hours, with an hour and half allowed for each side to present its case. Again, we are not persuaded by 180's argument.

{¶ 39} Pursuant to Evid.R. 611(A), a trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to * * * avoid needless consumption of time." An appellate court reviews the imposition of time

limitations on the presentation of evidence for an abuse of discretion.  *In re T.H.*, 192 Ohio App.3d 201, 2011-Ohio-248, ¶ 38 (2d Dist.).

{¶ 40} We cannot find that the time restriction at issue constituted an abuse of discretion.  Moreover, even if an abuse of discretion occurred, 180 waived that error when it failed to identify what evidence it would have offered if given additional time.  *See id.* at ¶ 39 ("Time limitations on evidence have been upheld where a party has not identified what additional evidence the party would have offered or how that evidence could have changed the court's judgment."); Evid.R. 103(A).

{¶ 41} Next, we turn to 180's argument that the trial court erred in finding CAM's and its attorneys' conduct was not frivolous under R.C. 2323.51(A)(2)(a)(ii).  We agree.

{¶ 42} Pursuant to R.C. 2323.51(B)(1), a court may award court costs, reasonable attorney fees, and other reasonable expenses to any party to a civil action who is adversely affected by frivolous conduct.  Prior to making such an award, the court must hold a hearing to determine: (1) whether the conduct at issue was frivolous, (2) if the conduct was frivolous, whether any party was adversely affected by it, and (3) the amount of the award, if any.  *Bennett v. Martin*, 10th Dist. No. 13AP-99, 2013-Ohio-5445, ¶ 17.  "Conduct" includes "[t]he filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action, the filing of a pleading, motion, or other paper in a civil action * * * or the taking of any other action in connection with a civil action."  R.C. 2323.51(A)(1).  "Frivolous conduct" means the conduct of a party or the party's attorney that satisfies any of the following:

> (i)  It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.

> (ii)  It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law.

> (iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

> (iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

R.C. 2323.51(A)(2)(a)(i) through (iv). A party who has commenced or persisted in maintaining a frivolous action may be assessed sanctions. *Carasalina LLC v. Bennett*, 10th Dist. No. 14AP-74, 2014-Ohio-5665, ¶ 30.

{¶ 43} Under R.C. 2323.51(A)(2)(a)(ii), conduct is frivolous if no reasonable attorney would have pursued legal action in light of the existing law. *Breen v. Total Quality Logistics*, 10th Dist. No. 16AP-3, 2017-Ohio-439, ¶ 17. This standard requires courts to perform an objective review of the allegedly frivolous conduct. *Bennett* at ¶ 18. "As a matter of law, an attorney's ignorance of the law or failure to investigate the law is not deemed objectively reasonable." *Kozar v. Bio-Medical Applications of Ohio, Inc.*, 9th Dist. No. 21949, 2004-Ohio-4963, ¶ 17. If a court "determine[s] that reasonable inquiry by a party's counsel of record should [have] reveal[ed] the inadequacy of a claim, a finding that the counsel of record has engaged in frivolous conduct is justified." *Ron Schneider & Assocs. v. London*, 81 Ohio St.3d 94, 97-98 (1998). Because a finding of frivolous conduct under R.C. 2323.51(A)(2)(a)(ii) results from a legal analysis, appellate courts review that finding de novo. *Vossman v. AirNet Sys.*, 10th Dist. No. 16AP-801, 2018-Ohio-1940, ¶ 21; *Breen* at ¶ 17.

{¶ 44} Here, 180 argues that CAM acted frivolously when it asserted that 180 fraudulently induced CAM into agreeing to the settlement agreement and release. 180 contends that this assertion was not warranted under existing law because CAM never had any evidence that 180 induced it to enter into the settlement agreement and release.

{¶ 45} "A release is an absolute bar to a later action on any claim encompassed within it, absent a showing of fraud, duress, or other wrongful conduct procuring it." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, ¶ 48. If a release is obtained through fraud in the inducement, the release is voidable. *Haller v. Borror Corp.*, 50 Ohio St.3d 10 (1990), paragraph one of the syllabus. To prove fraud in the inducement, "a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *ABM Farms v. Woods*, 81 Ohio St.3d

498, 502 (1998).  In asserting that fraud in the inducement has occurred, a plaintiff admits that it released its claim for damages, but maintains that it was induced to do so by the defendant's misrepresentation.  *Haller* at 14.  The fraud relates to facts inducing the release's execution, as, for example, where a party has misrepresented the economic value of a released claim.  *Id.*; *ABM Farms* at 502.

{¶ 46} In general parlance, to "induce" is "to move and lead (as by persuasion or influence)." *Webster's Third New International Dictionary* 1154 (1966).  An "inducement," therefore, is "something that induces," i.e., "a motive or consideration that leads one to action." *Id.*  A plaintiff establishes that a defendant induced it into executing a release by proving, first, that it relied on the defendant's misrepresentation and, second, that the misrepresentation was material.  A misrepresentation is material when, under the circumstances, it would likely affect the conduct of a reasonable person in determining whether to enter into the transaction at issue.  *Oryann, Ltd. v. SL & MB, LLC*, 11th Dist. No. 2014-L-119, 2015-Ohio-5461, ¶ 51; *Saxe v. Dlusky*, 10th Dist. No. 09AP-673, 2010-Ohio-5323, ¶ 48; *Weiker v. A.A. Green Realty*, 6th Dist. No. WD-05-081, 2006-Ohio-1860, ¶ 39; *Harrel v. Solt*, 4th Dist. No. 00CA027 (Dec. 27, 2000); *Leal v. Holtvogt*, 123 Ohio App.3d 51, 76 (2d Dist.1998); *accord* 1 Farnsworth, *Farnsworth on Contracts*, Section 4.12, at 480 (3d Ed.2004) ("The requirement of materiality is usually met by showing that the misrepresentation would have been likely to have induced a reasonable recipient to make the contract.").  In gauging materiality, a court applies an objective standard that generally precludes the consideration of any idiosyncratic qualities of the plaintiff.  *Saxe* at ¶ 48.

{¶ 47} We begin our review of whether 180 induced CAM by considering CAM's stated reasons for demanding the execution of a mutual release before it would release the escrowed funds to 180.  CAM offers two reasons:  (1) 180 stated that it could not close under the terms of the purchase agreement, and (2) 180 stated that it would close under the revised terms set out in the November 18, 2014 email.  Pack testified that he relied on these two representations when executing the settlement agreement and release.  Mere reliance, however, is insufficient to show inducement.  CAM also had to prove that those representations were material, i.e., they would likely motivate a reasonable person to enter into a release.

{¶ 48} CAM has never attempted to prove materiality. Instead, CAM dodges the issue altogether by arguing that 180 induced the settlement agreement and release because, but for 180's representations, the agreement would not exist. This argument completely ignores that CAM, not 180, demanded the release. Thus, for CAM's "but for" connection to exist, 180's representations must be proven material to the creation of the release, that is, the representations would likely lead a reasonable person in CAM's shoes to demand and execute a release. In other words, absent materiality, there is no basis for concluding that 180's representations induced the release.

{¶ 49} CAM's avoidance of the materiality issue likely stems from its inability to make the required showing. Nothing in the representations at issue would influence a reasonable person to act as CAM did. 180 essentially told CAM that it would not purchase the Innis Road property under the parameters of the original deal, but it would proceed under modified terms. Nothing in the content of that statement would cause a reasonable person to decide that he or she needed to demand a release for protection from future litigation.

{¶ 50} Indeed, Pack never testified that the representations at issue influenced or persuaded him to require the release. Pack instead stated:

> Mr. Norton contacted me and said, ["][H]ey, we've got a large and substantial amount of money that's in the escrow [account] to do this project and * * * you know, we're * * * done. We can't * * * do it. I'd like you to release that escrow [deposit].["]
>
> And at that point, I said, ["][O]kay[,] [i]f you want us to release the escrow [deposit], then * * * we need a release because you previously threatened to sue us.["]

(Apr. 6, 2017 Tr. at 63-64.) While Pack broadly claimed that he was duped into requesting the release, he did not explain how or why the representations at issue induced him to make that request.

{¶ 51} Prior to the inception of this action, CAM had all the facts it needed to determine whether 180 induced it into the release. Under the circumstances giving rise to this action, CAM simply could not establish that 180's alleged misrepresentations were material. The trial court recognized that in its summary judgment decision, where it ruled in 180's favor because CAM failed to "show[ ] how 180 Industrial's purported improper

conduct induced it into seeking a mutual release of claims." (Mar. 29, 2016 Decision and Entry at 14.) We thus conclude that no reasonable attorney would initially assert or continue to pursue the theory of fraud in the inducement. Consequently, CAM and its attorneys engaged in frivolous conduct as defined in R.C. 2323.51(A)(2)(a)(ii).

{¶ 52} 180 raises additional grounds for finding that CAM's and its attorneys' conduct was frivolous. However, "a party only needs a finding of frivolousness under one of the four definitions [set forth in R.C. 2323.51(A)(2)(a)] for an award of attorney fees." *Southard Supply, Inc. v. Anthem Contrs., Inc.*, 10th Dist. No. 16AP-545, 2017-Ohio-7298, ¶ 33. Our conclusion that CAM and its attorneys engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(ii) entitles 180 to the relief it requests on appeal: a reversal and remand of this matter for the trial court to consider whether to grant 180 reasonable attorney fees. Consequently, 180's other grounds for finding frivolousness are moot, and we do not address them.

{¶ 53} Next, 180 argues that the trial court erred in not addressing its argument that Alterra and its attorneys engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(ii). We agree. Although 180 raised this argument in its motion for sanctions and its objections to the magistrate's decision, the trial court did not consider it. The trial court erred in disregarding the argument.

{¶ 54} Given our rulings, we sustain 180's second assignment of error because (1) the trial court erred in failing to find that CAM and its attorneys engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(ii), and (2) the trial court erred in failing to address 180's request for sanctions against Alterra and its attorneys. We overrule 180's third assignment of error to the extent that it challenges the denial of discovery and the imposition of a time limitation for the sanctions hearing. We find that assignment of error moot in all other respects.

{¶ 55} For the forgoing reasons, we sustain in part and find moot in part the first assignment of error, we sustain the second assignment of error, and we overrule in part and find moot in part the third assignment of error. We reverse the judgment of the Franklin County Court of Common Pleas, and we remand this matter so the court may: (1) set forth its calculations and reasoning for determining the amount of reasonable attorney fees and costs owed to 180 under the fee-shifting provision of the settlement agreement and release;

(2) decide whether and, if necessary, how much reasonable attorney fees and costs are due to 180 for CAM's and its attorneys' frivolous conduct; and (3) determine whether Alterra and its attorneys engaged in any frivolous conduct and, if so, whether and, if necessary, how much reasonable attorney fees and costs are due to 180 for that conduct.

*Judgment reversed; cause remanded with instructions.*

**TYACK and SADLER, JJ., concur**

————————