[Cite as *Carasalina, L.L.C. v. Bennett*, 2014-Ohio-5665.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Carasalina LLC et al., | : | |
| Plaintiffs-Appellants, | : | |
| | : | **No. 14AP-74** |
| v. | : | (C.P.C. No. 11CVA-01-754) |
| Daniel Bennett, Esq. et al., | : | **(REGULAR CALENDAR)** |
| Defendants-Appellees. | : | |

## D E C I S I O N

### Rendered on December 23, 2014

*Chuparkoff & Junga LLP*, and *Mark A. Chuparkoff*, **for appellants.**

*Zeiger, Tigges & Little LLP*, *Marion H. Little, Jr.*, **and** *Kris Banvard*, **for appellees.**

**APPEAL from the Franklin County Court of Common Pleas**

KLATT, J.

{¶ 1} Plaintiffs-appellants, Carasalina LLC, and its attorney, Mark A. Chuparkoff, appeal a judgment of the Franklin County Court of Common Pleas awarding defendants-appellees, Daniel Bennett and Kegler, Brown, Hill & Ritter Co., L.P.A. ("Kegler Brown"), their attorney fees pursuant to R.C. 2323.51. For the following reasons, we affirm.

{¶ 2} The instant case arises from prior litigation between Carasalina and Scott Elliot Smith LPA ("SES"). Carasalina owned an office building located in Dublin, Ohio. SES leased office space from Carasalina to operate its law office. In January 2010, SES sued Carasalina, alleging that Carasalina breached the lease agreement between it and SES by interfering with SES' quiet enjoyment of the leased premises. SES requested and received a temporary restraining order ("TRO") that prohibited Carasalina from: (1)

terminating the lease agreement or commencing a forcible entry and detainer action against SES, (2) requiring SES to remove any boxes located in the office building's hallways, and (3) terminating internet service to SES.

{¶ 3} Laura Cook, the managing member of Carasalina, hired Kegler Brown to represent Carasalina in the SES litigation. Kegler Brown assigned the case to Bennett, who was then an associate at the law firm. Bennett represented Carasalina for one week, from January 29 to February 5, 2010.

{¶ 4} Bennett first met with Cook on January 29, 2010, the Friday after the issuance of the TRO. That meeting included Brandt Cook, Cook's son. Brandt Cook was the managing member of Big Thumb, LLC, Carasalina's other tenant, and a co-defendant in SES' action. Brandt Cook's attorney and Carasalina's business attorney also attended the meeting.

{¶ 5} During the January 29 meeting, Bennett and Cook discussed the issues in dispute between SES and Carasalina. First, Carasalina wanted SES to move boxes stored in a hallway because the boxes impeded access to an emergency exit in violation of the fire code. SES had refused to move boxes. Second, SES wanted a direct internet connection. At the time SES filed the lawsuit, SES accessed the internet through a server located in a part of the office building leased by Big Thumb. Both SES and Big Thumb wanted to end Big Thumb's involvement in providing SES with internet service, but to do so, the cable configuration in the building needed to be altered. Third, the day prior to the meeting, the office building had lost electricity because SES' employees were running space heaters, which tripped a circuit breaker. Cook was concerned that future similar incidents would jeopardize the security of confidential data contained on Big Thumb servers.

{¶ 6} Also during the meeting, the participants discussed transferring the case to the court's commercial docket. According to Bennett, no decision was reached on that issue. Cook contends that she gave Bennett a letter on Monday, February 1, that requested that Bennett take the steps necessary to transfer the case.

{¶ 7} According to Cook, at some point during the meeting, Carasalina's business attorney realized that he had received a faxed copy of a subpoena that SES had issued to Chase Bank. The subpoena sought copies of all checks from accounts on which Brandt Cook was a signatory that were payable to Carasalina or received from SES. Cook

remarked that she was not concerned about the subpoena because she banked with KeyBank, not Chase Bank. As Bennett later testified during the sanctions hearing, he does not recall seeing the Chase Bank subpoena or hearing Cook's remark.

{¶ 8} By the conclusion of the January 29 meeting, Bennett had ascertained that Cook initially wanted him to attempt to informally resolve the issues in dispute so that Carasalina could avoid the cost of a preliminary injunction hearing. Carasalina's ultimate goal was to get SES to vacate the leased premises.

{¶ 9} During the week following the January 29 meeting, Bennett worked to resolve the problems between SES and Carasalina. Bennett engaged in ongoing negotiations with SES' counsel, Christina Corl. As part of those negotiations, he drafted a proposal whereby Carasalina would waive payment of the rent for December 2009, January 2010, and February 2010 in return for SES leaving the premises, agreeing to termination of the lease, executing a mutual release, and dismissing the lawsuit. SES did not agree to the proposal.

{¶ 10} According to Bennett, on Saturday, January 30, he requested and received Cook's permission for SES to complete the work needed to secure its own internet connection. That work largely consisted of running coaxial cable throughout the part of the building that SES leased. On Tuesday, February 2, Bennett communicated Carasalina's authorization of the work to SES. SES' contractor began his work, but he was interrupted. On Friday, February 5, Cook sent an email to Bennett that stated, "At this time, no oral or written authorization is given for Scott Smith's IT vendor to perform work at the building." Lack of authorization stymied all further work.

{¶ 11} Cook maintains that she never authorized any work in the office building. According to Cook, she arrived at the building on Tuesday, February 2, and saw ceiling tiles dislodged and cables hanging down. Cook then spoke with Bennett, who urged Cook to allow the work to proceed. Cook sent the Friday, February 5 email to inform Bennett that she had decided not to follow his advice.

{¶ 12} On the morning of Monday, February 1, Bennett and Cook visited SES' offices. In Bennett's opinion, the office was too cold, so he recommended to Cook that she raise the temperature on the thermostat. Bennett made that recommendation for two reasons. First, Bennett hoped that more heat would cause SES' employees to discontinue

the use of space heaters and thereby prevent future electricity outages. Second, the low temperature of the building caused Bennett to worry that Carasalina might be breaching the lease. He recommended to Cook that she increase the heat in order to avoid the possibility that SES would introduce the temperature issue into the litigation.

{¶ 13} With regard to the boxes stored in the hallway, Bennett had little negotiating leverage because the TRO prevented Carasalina from unilaterally moving the boxes. Bennett, therefore, asked SES whether it would agree to move the boxes to another area within the building. SES did not object to that plan, but it wanted Carasalina to pay for the cost of moving the boxes. Cook, however, refused to pay.

{¶ 14} On Wednesday, February 3, SES' attorney, Christina Corl, served a subpoena on KeyBank requesting, in part, records of all deposits made in any account for which Cook was a signatory. When Bennett received a copy of the subpoena, he contacted Corl and told Corl that Carasalina would move to quash the subpoena unless SES reduced its scope. Corl refused to amend the subpoena, so Bennett drafted a motion for a protective order quashing the subpoena. Bennett drafted the motion as a joint motion of all defendants, and he included in the motion a challenge to the scope of the Chase Bank subpoena as well.

{¶ 15} On Friday, February 5, Bennett withdrew from representing Carasalina in the SES litigation. Bennett withdrew because Cook wanted impossible results, she objected to paying for the increased time needed to pursue the obstructionist strategy she favored, and she appeared to mistrust him. Although Bennett withdrew without filing the motion to quash, he gave his draft to Carasalina's new counsel, along with the remainder of the case file. Carasalina's new counsel, Chuparkoff, filed the motion to quash, largely unchanged, on Thursday, February 11.

{¶ 16} At the conclusion of its representation of Carasalina, Kegler Brown billed Carasalina $7,235. Carasalina did not pay this bill. In the fall of 2010, Bennett spoke with Chuparkoff regarding whether Carasalina intended to settle its account. On January 18, 2011, Carasalina and Cook filed the instant action, alleging legal malpractice. Specifically,

the complaint stated that Bennett had disclosed to Corl the identity of plaintiffs' bank, which enabled Corl to subpoena plaintiffs' banking records.[1]

{¶ 17} Defendants answered the complaint, and Kegler Brown filed a counterclaim for breach of contract, seeking the $7,235 owed for its legal services to Carasalina. Within a month of filing the answer and counterclaim, defendants moved for summary judgment on their counterclaim and plaintiffs' claims. In another motion, filed contemporaneously, defendants requested that the trial court sanction plaintiffs and their attorney under Civ.R. 11 and R.C. 2323.51.

{¶ 18} To support their motion for summary judgment on plaintiffs' claims, defendants relied on the affidavits from Bennett and Corl. In his affidavit, Bennett unequivocally denied "disclos[ing] any information regarding the location and identity of [plaintiffs'] bank accounts" to Corl. (Bennett affidavit, at ¶ 19.) Corl corroborated Bennett's denial. In her affidavit, Corl stated:

> The allegation that Bennett gave me any information which enabled me or my client to obtain Carasalina's bank information is untrue. At no time did Bennett ever provide any information to me concerning the financial accounts of Carasalina or Laura Cook * * *. * * * I learned the name of Carasalina's bank by looking at the back of cancelled checks and when I subpoenaed Key Bank they gave me information about Carasalina's bank accounts.

(Corl affidavit, at ¶ 7.) The cancelled checks Corl referenced were rent checks from SES to Carasalina. Corl authenticated copies of three cancelled rent checks, and she pointed out that "[o]n the reverse side of each check is printed the name of Key Bank and a number that we believed to be Carasalina's account number." (Corl affidavit, at ¶ 6.)

{¶ 19} In their motion for sanctions, defendants argued that plaintiffs' claims were not supported by good grounds, had no evidentiary support, and were not warranted by existing law or a good-faith argument for the expansion or reversal of existing law. Defendants also pointed out that both Bennett and Corl had testified in their affidavits that plaintiffs had not contacted them prior to filing the lawsuit to inquire into the truth of

---

[1] Carasalina and Cook are the plaintiffs in the underlying action, and, thus, we refer to them as "plaintiffs." Cook is not a party to this appeal, but Chuparkoff is. Consequently, when we use the term "appellants," we mean Carasalina and Chuparkoff.

the allegations made in the complaint.  It appeared, therefore, that plaintiffs had failed to investigate the factual grounds for their claims.

{¶ 20} In response to defendants' motions, plaintiffs continued to assert that Bennett had disclosed Carasalina's banking information to Corl.  Plaintiffs maintained this position based on the "CID" information printed on the pages containing images of the cancelled checks.  Plaintiffs contended that the CID information indicated that Corl requested copies of the cancelled checks from SES' bank on January 29, 2010.  Plaintiffs found this fact significant because Cook allegedly told Bennett that she banked at KeyBank on January 29.  Based on this coincidence of timing, plaintiffs surmised that Bennett had disclosed their banking information to Corl and argued that a genuine issue of material fact remained regarding how Corl acquired Carasalina's banking information.

{¶ 21} In addition to persisting with the theory of the case advanced in their complaint, plaintiffs also bolstered their legal malpractice claim with new theories. Plaintiffs asserted, for the first time, that defendants also beached their duty to Carasalina by: (1) failing to request a transfer of the case to the commercial docket, (2) failing to file the motion to quash the KeyBank subpoena, and (3) permitting SES to perform some of the work necessary to give SES an independent internet connection in contravention to Cook's instructions.

{¶ 22} The trial court did not rule on defendants' motions.  With the discovery period passing, the parties proceeded to engage in discovery.

{¶ 23} On March 27, 2012, plaintiffs moved for summary judgment.  In their motion, plaintiffs continued to advance the grounds for legal malpractice previously alleged, including their theory that Bennett told Corl that Carasalina had accounts at KeyBank.  Additionally, plaintiffs again expanded the number of theories on which they rested their legal malpractice claim.  The new grounds for malpractice included:  (1) failing to provide a fee agreement and engagement letter until after withdrawing as counsel, (2) attempting to convince Cook to allow SES employees to run space heaters and increase the building temperature, (3) instructing Carasalina to remove the boxes stored in the hallway itself, and (4) telling Cook that she should not bicker over the rent owed under the lease agreement.  Moreover, plaintiffs maintained that Bennett "lacked any experience and foundation to adequately represent Carasalina," he "elected to cave to the

absurd demands of Corl and SES," and "Bennett and Kegler [Brown] were simply interested in obtaining a large retainer from Carasalina without any intention of seeing this matter to fruition."  (R. 75 at 7, 8.)

{¶ 24} Although plaintiffs' motion cited a panoply of grounds for legal malpractice, plaintiffs' expert witness, Jeffrey Lucas, testified that Bennett breached the standard of care in only four ways.   In the affidavit attached to plaintiffs' motion for summary judgment, Lucas stated that Bennett deviated from the standard of care by:  (1) "disclosing confidential information to [Scott] Smith[ ] and Christina Corl," (2) "failing to file a petition to transfer this matter to [the] commercial court despite repeated requests from Laura Cook and Carasalina LLC," (3) "failing to file a Motion to Quash the subpoenas directed to Laura Cook and Carasalina's banking institution," and (4) together with Corl, Brandt Cook's attorney, and Scott Smith, "participat[ing] in a conspiracy to extort money from Laura Cook and/or Brandt Cook through improper legal proceedings and failing to represent the interest of their clients."  (Lucas affidavit, at ¶ 18-21.)

{¶ 25} On July 24, 2013, the trial court issued a decision granting defendants' motion for summary judgment on plaintiffs' claims, denying defendants' motion for summary judgment on their counterclaim, and denying plaintiffs' motion for summary judgment.   After reviewing parties' evidence, the trial court concluded that plaintiffs founded their allegations of disclosure of banking information and conspiracy merely on subjective belief and speculation.   The trial court also rejected plaintiffs' claims that Bennett committed malpractice in failing to transfer the case to the commercial docket and failing to file the motion to quash.   Finally, the trial court denied defendants' motion for summary judgment on their counterclaim because genuine issues of material fact remained regarding the amount of legal work completed and the value of that work.

{¶ 26} The trial court then held a hearing on defendants' motion for sanctions.  At the conclusion of the hearing, the trial court awarded defendants their attorney fees under R.C. 2323.51.   The trial court found that Carasalina's claims were unsupported by any material facts and without a colorable basis in the substantive law governing legal malpractice.

{¶ 27} After the parties settled defendants' counterclaim, the trial court issued a final judgment in defendants' favor.  In the December 31, 2013 judgment, the trial court

also ordered Carasalina and Chuparkoff, jointly and severally, to pay $46,882.62 in attorney fees.

{¶ 28} Carasalina and Chuparkoff now appeal the December 31, 2013 judgment, and they assign the following errors:

> I. The Court of Common Pleas abused its discretion when it granted Defendants/Appellees' Motion for Sanctions under [R.C.] 2323.51(A) as such was against the manifest weight of [the] evidence presented at [the] hearing and an abuse of the Court's discretion when there was no evidence of frivolous or malicious misconduct.
>
> II. The Trial Court erred as a matter of law when it awarded clearly excessive and unreasonable attorney's fees.

{¶ 29} By appellants' first assignment of error, they argue that the trial court erred in finding that their conduct met the definition of "frivolous conduct" set forth in R.C. 2323.51(A)(2)(a)(ii) and (iii). We disagree.

{¶ 30} Pursuant to R.C. 2323.51(B)(1), a court may award court costs, reasonable attorney fees, and other reasonable expenses to any party to a civil action who is adversely affected by frivolous conduct. Prior to making such an award, the court must hold a hearing to determine: (1) whether the conduct at issue was frivolous, (2) if the conduct was frivolous, whether any party was adversely affected by it, and (3) the amount of the award, if any. *Bennett v. Martin*, 10th Dist. No. 13AP-99, 2013-Ohio-5445, ¶ 17. "Conduct" includes "[t]he filing of a civil action, the assertion of a claim, defense, or other position in connection with a civil action, the filing of a pleading, motion, or other paper in a civil action * * * or the taking of any other action in connection with a civil action." R.C. 2323.51(A)(1). "Frivolous conduct" means the conduct of a party or the party's attorney that satisfies any of the following:

> (i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.
>
> (ii) It is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be

supported by a good faith argument for the establishment of new law.

(iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

(iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

R.C. 2323.51(A)(2)(a)(i) through (iv). Any party who has commenced or persisted in maintaining a frivolous action may be assessed sanctions. *Guy v. Axe*, 3d Dist. 14-09-31, 2010-Ohio-986, ¶ 10.

{¶ 31} Here, appellants' argument on appeal requires us to examine R.C. 2323.51(A)(2)(a)(ii) and 2323.51(A)(2)(a)(iii). Under R.C. 2323.51(A)(2)(a)(ii), conduct is frivolous when no reasonable attorney would have brought the action in light of the existing law. *Groves v. Groves*, 10th Dist. No. 09AP-1107, 2010-Ohio-4515, ¶ 17. This test presents a legal question, which appellate courts review de novo. *Id.* at ¶ 18.

{¶ 32} Unlike R.C. 2323.51(A)(2)(a)(ii), R.C. 2323.51(A)(2)(a)(iii) presents a factual question; namely, whether a party's allegations have evidentiary support. *Hunt v. Allen*, 5th Dist. No. 11-CA-70, 2012-Ohio-1212, ¶ 33. The language used in R.C. 2323.51(A)(2)(a)(iii) is similar to the language in Fed.R.Civ.P. 11(b)(3), which states that, by presenting a pleading to the court, an attorney or unrepresented party certifies that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Pursuant to Fed.R.Civ.P. 11(c), a trial court may impose sanctions if it determines that a party has violated Fed.R.Civ.P. 11(b)(3). Therefore, both R.C. 2323.51 and Fed.R.Civ.P. 11 sanction the same behavior: asserting a claim lacking (or not likely to have) evidentiary support.

{¶ 33} Ohio courts may rely on federal authority interpreting a federal rule to explicate a similar state rule. *Stammco, L.L.C. v. United Tel. Co.*, 136 Ohio St.3d 231, 2013-Ohio-3019, ¶ 18. Although R.C. 2323.51(A)(2)(a)(iii) is a statutory provision and not

a rule, we find the federal authority interpreting Fed.R.Civ.P. 11(b)(3) instructive.  Thus, we turn to that authority to determine how to construe R.C. 2323.51(A)(2)(a)(iii).

{¶ 34} The Advisory Committee Notes on the 1993 amendments to Fed.R.Civ.P. 11(b)(3) state that a party must provide " 'evidentiary support' for the allegation, not [establish] that [it] will prevail with respect to its contention regarding the fact."  Thus:

> [t]hat summary judgment is rendered against a party does not necessarily mean * * * that it had no evidentiary support for its position.  On the other hand, if a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient "evidentiary support" for purposes of Rule 11.

*Id; accord Wrinch v. Miller*, 183 Ohio App.3d 445, 2009-Ohio-3862, ¶ 55 (9th Dist.) ("[T]he fact that summary judgment was denied demonstrates that [the plaintiff] provided at least some factual basis to support the claims.").

{¶ 35} Moreover, according to the Advisory Committee Notes, Fed.R.Civ.P. 11(b)(3) recognizes that "sometimes a litigant may have good reason to believe that a fact is true or false but may need discovery, formal or informal, from opposing parties or third persons to gather and confirm the evidentiary basis for the allegation."  However, if a litigant does not obtain evidentiary support after a reasonable opportunity for further investigation or discovery, "the party has a duty under [Fed.Civ.R. 11(b)(3)] not to persist with that contention."  *Id.*

{¶ 36} Using this authority to interpret R.C. 2323.51(A)(2)(a)(iii), we conclude that a party only needs minimal evidentiary support for its allegations or factual contentions in order to avoid a frivolous conduct finding.  If a party makes an allegation or factual contention on information or belief, then the party must have the opportunity to investigate the truth of that allegation or factual contention.  However, if a party persists in relying on that allegation or factual contention when no evidence supports it, then the party has engaged in frivolous conduct under R.C. 2323.51(A)(2)(a)(iii).

{¶ 37} Because a finding of frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) results from a factual analysis, appellate courts afford such a finding a degree of deference.  *Hunt*, 2012-Ohio-1212, at ¶ 27, 33.  Appellate courts will not reverse a determination that conduct is frivolous under R.C. 2323.51(A)(2)(a)(iii) unless the record

lacks competent, credible evidence to support the trial court's factual findings.  *Id.*; *Groves*, 2010-Ohio-4515, at ¶ 18.

{¶ 38} Here, the trial court determined that no evidence supported the allegations that Bennett disclosed Carasalina's banking information to opposing counsel or engaged in a conspiracy with the other attorneys involved in the case.  Bennett's and Corl's affidavit testimony—attached to appellees' motion for summary judgment—precluded all possibility of any wrongful disclosure or conspiracy.  Appellants, however, turned a blind eye to the evidence that unequivocally refuted their allegations.  The trial court concluded that appellants' persistence in pursuing disproven allegations amounted to frivolous conduct under R.C. 2323.51(A)(2)(a)(iii).  We agree.

{¶ 39} On appeal, appellants do not focus on the trial court's R.C. 2323.51(A)(2)(a)(iii) determination.  Rather, they concentrate on the theories of legal malpractice that they raised subsequent to the complaint, and they argue that existing law warrants a legal malpractice claim based on those theories.  Appellants contend that if we agree with them that any of the other grounds for legal malpractice are not frivolous, then we must find that the trial court erred in finding any frivolous conduct.  We cannot agree with appellants' reasoning.  If a party is adversely affected by any frivolous conduct, a trial court may make an award under R.C. 2323.51.  In other words, a party's non-frivolous conduct does not ameliorate or eliminate its frivolous conduct.  The trial court does not weigh a party's "good" conduct against its "bad" conduct to determine whether frivolous conduct occurred.  Rather, engaging in any conduct defined as "frivolous" in R.C. 2323.51(A)(2) may result in an award of reasonable attorney fees.

{¶ 40} Moreover, almost all appellants' other grounds for the legal malpractice claim are frivolous under R.C. 2323.51(A)(2)(a)(ii).  Appellants raise six other grounds: (1) failure to transfer the case to the trial court's commercial docket, (2) failure to file the motion to quash, (3) the recommendation that Carasalina pay for moving the boxes stored in the hall, (4) the recommendation that Carasalina forgive three months' rent payments, (5) the recommendation that Carasalina raise the heat in the office building, and (6) allowing SES to begin the work necessary for SES to acquire an independent internet connection.  The trial court found these grounds lacking.

{¶ 41} To establish a claim for legal malpractice, a plaintiff must show: (1) the attorney owed a duty or obligation to the plaintiff, (2) a breach of the duty or obligation and the attorney failed to conform to the standard required by law, and (3) a causal connection between the conduct complained of and the resulting damage or loss. *Vahila v. Hall*, 77 Ohio St.3d 421 (1997), syllabus. Here, with the exception of one ground, no reasonable attorney would bring a legal malpractice claim based on the grounds appellants assert because, for some grounds, there is no evidence of a breach and, for others, there is no evidence of damages.

{¶ 42} With regard to the commercial-docket and motion-to-quash grounds, appellants cannot show any evidence of harm resulting from Bennett's alleged failures. As the trial court stated about these two grounds:

> [I]t is important to recall that the *Smith* case ultimately transferred—only a short time after Bennett was relieved as counsel * * *. The time delay in doing so was neither remarkable nor was any harm caused Carasalina from the few-days delay. Again, these facts were apparent long before this case was filed in 2011. It was frivolous to assert and persist in this as part of the legal malpractice claim.
>
> * * * [W]hile [Bennett] was still counsel[,] a motion to quash the subpoena for Key Bank material was in fact drafted by Bennett almost immediately after the issue arose. Once relieved, Bennett turned his draft over to replacement counsel Chuparkoff. Chuparkoff filed substantially the same motion (joined by [Brandt Cook's counsel]) days later on or about Feb. 11, 2010. No demonstrable harm to Carasalina occurred from the delay in filing the motion to quash, such as might have colorably justified a legal malpractice claim against Bennett when seen from the vantage point of early 2011 when this case was brought.

(R. 137 at ¶ Z and AA.)

{¶ 43} With regard to the boxes, rent, and heating grounds, appellants have shown only disagreement with Bennett's recommendations, not a breach of duty. Per Cook's instruction, Bennett tried to compromise with SES in order to avoid the cost of litigating. To achieve the desired outcomes—the removal of the boxes, SES leaving the office building, and cessation of the electrical outages—Cook had to make concessions: pay

movers, forgive three months' rent, and raise the heat.  Ultimately, Cook evaluated the price of the concessions as too high, and she refused the recommended compromises. Cook's dislike, and ultimate rejection, of her attorney's advice did not render that advice negligent.  As the trial court stated, Cook's "apparent misunderstanding of the litigation process, coupled with impatience and emotional distress[,] did not translate what Bennett tried to do into legal malpractice."  (R. 137 at ¶ HH.)  As Bennett's recommendations do not equate to legal malpractice, appellants' assertion of them as grounds for such a claim is frivolous.

{¶ 44} Only with regard to appellants' last ground—the authorization of the installation of coaxial cable—do we conclude that appellants alleged a legal malpractice claim that surmounts the frivolous threshold.  Bennett testified that he secured Cook's permission to proceed with the work necessary for SES' independent internet connection. Cook denied giving this permission, and she presented evidence that SES' contractor damaged the office building when installing coaxial cable.  An attorney who fails to follow a client's instructions may be liable for legal malpractice.  *McInnis v. Hyatt Legal Clinics*, 10 Ohio St.3d 112, 112-13 (1984).  Given Cook's testimony that Bennett disregarded her instructions, we conclude that appellants did not act frivolously in bringing a legal malpractice claim based on the occurrence of internet-related work.

{¶ 45} Even though one of appellants' grounds for the legal malpractice claim is not frivolous under R.C. 2323.51(A)(2)(a)(ii), reversal of the trial court's judgment is not warranted.    In  addition  to  finding  appellants'  conduct  frivolous  under  R.C. 2323.51(A)(2)(a)(ii) and (iii), the trial court also determined that appellants' conduct satisfied  R.C.  2323.51(A)(2)(a)(i),  which  includes  conduct  that  merely  serves  an "improper purpose."  The trial court found that "improper purpose was a key part of what occurred here, namely plaintiffs' misguided effort to try to gain 'leverage' or head-off an attorney fees claim by Carasalina's former lawyers."  (R. 137, at ¶ W.)  Appellants do not mention this finding at all, much less present any argument for its reversal.  Therefore, it stands unchallenged as an independent basis for the trial court's finding of frivolousness.

{¶ 46} In  sum,  we  conclude  that  the  trial  court  did  not  err  in  finding  that appellants engaged in frivolous conduct.  Carasalina filed suit solely on the theory that Bennett disclosed its banking information to opposing counsel.  When appellees' evidence

unequivocally refuted that theory, Carasalina refused to concede the factual impossibility of its disclosure allegations and, additionally, raised a grab bag of other unprovable bases for its claim. These actions constitute frivolous conduct sanctionable under R.C. 2323.51. Accordingly, we overrule appellants' first assignment of error.

{¶ 47} By their second assignment of error, appellants argue that the trial court erred in awarding appellees the attorney fees they incurred during the two-year period during which appellees' motions for summary judgment and motion for sanctions were pending. We disagree.

{¶ 48} Where a trial court has found that frivolous conduct occurred, the decision to assess a penalty lies within the sound discretion of the trial court. *Judd v. Meszaros*, 10th Dist. No. 10AP-1189, 2011-Ohio-4983, ¶ 19. Appellate courts, therefore, review such a decision for an abuse of discretion. *Bennett*, 2013-Ohio-5445, at ¶ 19.

{¶ 49} Here, appellees were forced to defend a lawsuit premised on frivolous allegations and claims during the two-year period at issue. Appellees expended funds so that its attorneys could conduct discovery, respond to Carasalina's discovery requests, and oppose Carasalina's motion for summary judgment. We find no abuse of discretion in the trial court's decision to award appellees the attorney fees incurred for that work. Accordingly, we overrule appellants' second assignment of error.[2]

{¶ 50} For the foregoing reasons, we overrule appellants' first and second assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

SADLER, P.J., and LUPER SCHUSTER, J., concur.

———————————

[2] Tangentially, we note that appellants' argument in support of the second assignment of error includes the unsubstantiated assertion that the trial court ruled against them out of a predetermined bias. Such an accusation is inappropriate.