[Cite as *Williams v. Natl. Assn. for the Advancement of Colored People*, 2023-Ohio-3948.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Noel Williams,                                    :

      Plaintiff-Appellee,              :

[Adam J. Grosshandler et al.,          :

      Plaintiffs-Appellees],          :
                               No. 22AP-492
v.                                                :          (C.P.C. No. 14CV-9504)

National Association for the              :          (REGULAR CALENDAR)
Advancement of Colored People et al.,

      Defendants-Appellants.          :

                                    :

---

D E C I S I O N

Rendered on October 31, 2023

---

**On brief:** *The Tyack Law Firm Co., LPA, Jonathan T. Tyack,* and *Holly B. Cline*, for appellee Noel Williams. **Argued:** *Jonathan T. Tyack*.

**On brief:** *Adam J. Grosshandler*, pro se. **Argued:** *Adam J. Grosshandler*.

**On brief:** *Samil C. Pullen*, pro se.

**On brief:** *The Gittes Law Group*, *Frederick M. Gittes*, and *Jeffrey P. Vardaro*, for appellant National Association for the Advancement of Colored People; *James E. Workman, Jr.*, for appellant Sybil Edwards-McNabb. **Argued:** *Jeffrey P. Vardaro*.

---

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendants-appellants National Association for the Advancement of Colored People ("NAACP") and Sybil Edwards-McNabb ("McNabb") (collectively, "appellants"), appeal from a decision and entry of the Franklin County Court of Common Pleas denying their motion for sanctions, pursuant to R.C. 2323.51 and Civ.R. 11, against plaintiff-appellee, Noel Williams, and her former counsel Carrie Varner (collectively, "appellees"). Appellants also sought sanctions against Williams' two former pro bono attorneys, Adam J. Grosshandler, and Samil C. Pullen.

## I. Facts and Procedural History

{¶ 2} This matter arises from the July 14, 2022 judgment and entry of the common pleas court which the trial court issued upon remand from our decision in *Williams v. NAACP*, 10th Dist. No. 18AP-476, 2019-Ohio-1897 ("*Williams I*"). As our prior decision thoroughly reviewed the facts as they pertain to the present case, we adopt such discussion here. *See id* at ¶ 2-8. Below, we outline additional facts as they pertain to the issue of sanctions.

{¶ 3} On September 12, 2014, appellees filed a complaint alleging several contractual claims, intentional infliction of emotional distress, and defamation. Regarding the defamation claim, the complaint averred that on August 15, 2013, Ohio NAACP President McNabb published "a false statement about [Williams] * * * in a malicious attempt to harm" her reputation, NAACP membership status, and position as president of the Columbus NAACP branch office. (Compl. at 7-8.) The parties conducted discovery for more than three years, producing an extensive record detailing, among other things, McNabb's allegedly defamatory statements and the damage they purportedly caused Williams' reputation.

{¶ 4} On February 5, 2018, appellants each filed a motion for summary judgment, and on February 23, 2018, they filed a joint motion for sanctions against appellees in which they accused Williams and her attorneys of "providing knowingly false interrogatory answers and produc[ing] fabricated evidence" for the apparent purpose of complying with the statute of limitations. (Sept. 15, 2020 Mot. for Sanctions at 1.) Appellants sought an award of attorney fees and expenses commensurate with the cost of defending against appellees' allegedly frivolous discovery filings. Appellees opposed both summary judgment

motions but did not defend against the motion for sanctions. On May 15, 2018, the trial court granted appellants' summary judgment motions and denied the motion for sanctions. On appeal, this court affirmed the trial court's summary judgment decisions but reversed its denial of sanctions, remanding with instructions for the trial court to consider the motion for sanctions.

{¶ 5} The trial court then held a sanctions hearing on September 8, 2020. In spite of appellants' objections and specific allegations that Varner, Williams' former counsel, filed fraudulent documents into evidence, the trial court dismissed Varner from the hearing. Three witnesses testified in support of the motion for sanctions: James Workman, an attorney representing McNabb; Annie Ross-Womack, McNabb's special assistant at NAACP; and Jeffrey P. Vardaro, an attorney representing NAACP. Appellees called no witnesses to testify at the hearing. On October 20, 2020, the trial court declined appellants' request to schedule a second sanctions hearing and decided instead to resolve the issue based on submissions to the docket. The record includes the depositions of many witnesses relevant to the issue of sanctions, including McNabb and Varner. On July 14, 2022, the trial court again denied the motion for sanctions. The trial court tersely explained it did "not find sufficient evidence to award sanctions under Civil Rule 11 or O.R.C. 2323.51." (Order & Entry at 6.)

## II. Assignment of Error

{¶ 6} Appellants present the following assignment of error for our review:

> The trial court abused its discretion in denying Defendants' motion for sanctions in light of the extreme litigation misconduct committed by Plaintiff and her former counsel throughout the original litigation, the prior appeal, and even during the sanctions proceedings themselves, much of which the trial court completely ignored and omitted reference to in its order denying sanctions.

## III. Analysis

{¶ 7} In their sole assignment of error, appellants contend the trial court erred in denying their motion for sanctions and attorney fees pursuant to R.C. 2323.51 and Civ.R. 11. Ohio law provides "separate mechanisms * * * for an aggrieved party to seek attorney fees for frivolous conduct—R.C. 2323.51 and Civ.R. 11." *Thomas v. Murry*, 8th Dist. No. 109287, 2021-Ohio-206, ¶ 34, citing *In re Estate of O'Toole*, 8th Dist. No. 108122, 2019-

Ohio-4165, ¶ 22. "While both R.C. 2323.51 and Civ.R. 11 authorize the award of attorney fees as a sanction for frivolous conduct, they present separate standards of proof and differ in application." *Id.*, citing *O'Toole* at ¶ 22.

{¶ 8} Under Civ.R. 11, an attorney's signature certifies the attorney: (1) "has read the document," (2) to the best of the attorney's "knowledge, information, and belief there is good ground to support it," and (3) "that it is not interposed for delay." A trial court examining an alleged Civ.R. 11 violation employs a subjective "bad-faith" standard in which it determines whether an attorney violated the rule willfully or merely negligently. *See Stafford v. Columbus Bonding Ctr.*, 177 Ohio App.3d 799, 2008-Ohio-3948, ¶ 8 (10th Dist.), citing *Ceol v. Zion Industries, Inc.*, 81 Ohio App.3d 286, 290 (9th Dist.1992). Only a "willful violation" of Civ.R. 11 may result in "an award to the opposing party of expenses and reasonable attorney fees incurred in bringing any motion under this rule." Civ.R. 11; *Crockett v. Crockett*, 10th Dist. No. 02AP-482, 2003-Ohio-585, ¶ 16 ("[S]anctions are not supportable under [Civil] Rule 11 in the absence of a finding that the filing was willful."). Penalties under Civ.R. 11 may be levied only against attorneys or pro se litigants. An appellate court may not reverse a trial court's Civ.R. 11 sanctions decision absent a showing the trial court abused its discretion. *Williams I* at ¶ 35, citing *Brust v. Franklin Cty. Sheriff's Office*, 10th Dist. No. 16AP-502, 2016-Ohio-7876, ¶ 9.

{¶ 9} Under R.C. 2323.51, a court "may assess and make an award to any party to the civil action or appeal who was adversely affected by frivolous conduct." R.C. 2323.51(B)(1). This statute was "not intended to punish mere misjudgment or tactical error," but rather "to chill egregious, overzealous, unjustifiable, and frivolous action." *Thomas* at ¶ 38, citing *Turowski v. Johnson*, 70 Ohio App.3d 118, 123 (9th Dist.1991), and *Turowski v. Johnson*, 68 Ohio App.3d 704, 706 (9th Dist.1990). Frivolous conduct has multiple definitions under this statute that are addressed separately below. In R.C. 2323.51, conduct is understood broadly to mean the actions typically taken by a party or a party's counsel as they relate to litigation, such as filing suit, claims, defenses, pleadings, appeals, or other motions in connection to a civil action. *See Uting v. Zimmer*, 10th Dist. No. 21AP-627, 2022-Ohio-3248, ¶ 30, quoting *Russell v. Ryan*, 10th Dist. No. 20AP-176, 2021-Ohio-2505, ¶ 14. Unlike the bad-faith standard of Civ.R. 11, a court determines whether a party or a party's counsel engaged in frivolous conduct under

R.C. 2323.51 using an objective test, "without reference to what the individual knew or believed." *Stafford* at ¶ 8, citing *Stevenson v. Bernard*, 11th Dist. No. 2006-L-096, 2007-Ohio-3192, ¶ 41.   R.C. 2323.51 is therefore "broader in scope than Civ.R. 11." *Id.*, citing *State Farm Ins. Cos. v. Peda*, 11th Dist. No. 2004-L-082, 2005-Ohio-3405, ¶ 25.   Any person "who has commenced or persisted in maintaining a frivolous action may be assessed sanctions" under R.C. 2323.51. *Calypso Asset Mgt., L.L.C. v. 180 Indus., L.L.C.*, 10th Dist. No. 18AP-53, 2019-Ohio-2, ¶ 42, citing *Carasalina L.L.C. v. Bennett*, 10th Dist. No. 14AP-74, 2014-Ohio-5665, ¶ 30.   An award pursuant to this statute may include "court costs, reasonable attorney's fees, and other reasonable expenses incurred in connection with the civil action or appeal." R.C. 2323.51(B)(1).

{¶ 10} Frivolous conduct under R.C. 2323.51(A)(2)(a)(ii) means the conduct of a party or the party's counsel of record that "is not warranted under existing law, cannot be supported by a good faith argument for an extension, modification, or reversal of existing law, or cannot be supported by a good faith argument for the establishment of new law." In objectively reviewing allegedly frivolous conduct under R.C. 2323.51(A)(2)(a)(ii), " 'an attorney's ignorance of the law or failure to investigate the law is not deemed objectively reasonable.' " *Calypso* at ¶ 43, quoting *Kozar v. Bio-Medical Applications of Ohio, Inc.*, 9th Dist. No. 21949, 2004-Ohio-4963, ¶ 17.   A party's counsel has engaged in frivolous conduct if a " 'reasonable inquiry by a party's counsel of record should [have] reveal[ed] the inadequacy of a claim.' " *Id.*, quoting *Ron Scheiderer & Assocs. v. London*, 81 Ohio St.3d 94, 97-98 (1998).   A reviewing court applies a de novo standard of review for determinations made under R.C. 2323.51(A)(2)(a)(ii) because such findings necessitate a legal analysis. *Calypso* at ¶ 43, citing *Vossman v. AirNet Sys., Inc.*, 10th Dist. No. 16AP-801, 2018-Ohio-1940, ¶ 21.

{¶ 11} Frivolous conduct under R.C. 2323.51(A)(2)(a)(iii) means conduct that "consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." In contrast to the de novo standard of review in R.C. 2323.51(A)(2)(a)(ii) determinations, a reviewing court examines a trial court's findings made pursuant to R.C. 2323.51(A)(2)(a)(iii) with "a degree of deference" because they present the factual question of "whether a party's allegations have evidentiary

support." *Carasalina* at ¶ 37; 32. "Review of a trial court's factual determinations is subject to deference and will not be disturbed where the record contains competent, credible evidence to support the trial court's findings." *Breen v. Total Quality Logistics*, 10th Dist. No. 16AP-3, 2017-Ohio-439, ¶ 11, citing *Brisco v. U.S. Restoration & Remodeling, Inc.*, 10th Dist. No. 14AP-533, 2015-Ohio-3567, ¶ 35. For civil cases in which a trial judge is the factfinder, an appellate court that finds the trial court judgment to be "against the manifest weight of the evidence * * * shall reverse" the trial court and do one of two things: (1) weigh the evidence and render the judgment the trial court should have rendered, or (2) remand the case to the trial court for further proceedings. App.R. 12(C)(1). "[I]n reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Chefor v. Morgan*, 10th Dist. No. 13AP-100, 2013-Ohio-4213, ¶ 10, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

{¶ 12} Separate from the trial court's determination of whether a party engaged in frivolous conduct, the appellate court reviews the trial court's decision whether to impose sanctions for an abuse of discretion. *See Breen* at ¶ 11 ("[T]he decision whether to assess a penalty lies within the sound discretion of the trial court."); *Brust* at ¶ 9 (permitting an appellate court to reverse "[a] decision to impose sanctions" under Civ.R. 11 or R.C. 2323.51 only if the trial court abused its discretion). "An abuse of discretion occurs when a trial court's discretionary judgment is unreasonable, arbitrary, or unconscionable." *Williams v. Am. Homes 4 Rent Mgt. Holdings, Inc.*, 10th Dist. No. 18AP-627, 2019-Ohio-3740, ¶ 27, citing *State ex rel. McCann v. Delaware Cty. Bd. of Elections*, 155 Ohio St.3d 14, 2018-Ohio-3342, ¶ 12, and *State v. Meek*, 10th Dist. No. 16AP-549, 2017-Ohio-9258, ¶ 23.

{¶ 13} In the present case, the below analysis details conduct that is surely frivolous. Civ.R. 11, however, mandates a trial court find the attorney violated the rule willfully and in "bad-faith" before sanctions may be imposed. *Stafford* at ¶ 8, citing *Ceol* at 290. Due in large part to this heightened standard of proof, there is simply not enough evidence before us to demonstrate the trial court's denial of sanctions under Civ.R. 11 was "unreasonable, arbitrary, or unconscionable." *Williams* at ¶ 27. Thus, we cannot conclude the trial court abused its discretion in denying sanctions pursuant to Civ.R. 11.

{¶ 14} R.C. 2323.51 "addresses conduct that serves to harass or maliciously injure the opposing party in a civil action or is unwarranted under existing law and for which no good-faith argument for extension, modification, or reversal of existing law may be maintained." (Internal quotations and citations omitted.) *State ex rel. Haley v. Davis*, 145 Ohio St.3d 297, 2016-Ohio-534, ¶ 16. Accordingly, we must determine whether Williams' and Varner's conduct constituted frivolous conduct within the meaning of R.C. 2323.51. We include a detailed examination of the record to aid our analysis.

{¶ 15} McNabb first became involved in the events underlying this case when she received an email from Jodi Howell, who had briefly partnered on an NAACP project with Williams. Howell emailed McNabb on August 15, 2013, accusing Williams of verbal assault and physical intimidation. The following day, August 16, 2013, Howell notified McNabb via a second email that she had just filed a police report regarding Williams' behavior and intended to pursue criminal charges. On August 19, 2013, McNabb forwarded Howell's email about filing a police report against Williams to the following high-ranking NAACP employees: Gill Ford, Jerome Reide, Olie Burton, Derrick Forward, and Emmanuel Stone. The complaint erroneously claimed McNabb published the allegedly defamatory statement on August 15, 2013, but in reality that was the day she received the initial email from Howell—McNabb actually forwarded Howell's email on August 19, 2013. McNabb's act of forwarding the Howell email was thus the basis of Williams' claim of defamation.

{¶ 16} The particular dates of the above email messages are crucial because Williams filed her complaint on September 12, 2014, alleging a defamatory statement published on August 15, 2013 (as discussed, the actual date of publication was August 19, 2013). Ohio enforces a one-year statute of limitations on claims of defamation. R.C. 2305.11(A). If the cause of action occurred more than one year before the complaint was filed, as it did here, the claim is considered frivolous and must be promptly dismissed. Appellants contend appellees realized their mistake too late, and, rather than accept responsibility for overlooking the statute of limitations when filing the complaint, they forged an email message purporting to reveal McNabb commenting on the Howell allegations mere days within the statute of limitations. This allegedly fraudulent email (hereinafter, "the September email") appeared on its face to have been sent by McNabb on September 15, 2013 to Ophelia Averitt, Kenneth Burke, Derrick Forward, Emmanuel Stone,

and the Ohio NAACP Executive Committee. The September email was then supposedly forwarded to Williams by someone referred to as "annr" on September 18, 2013. Appellants allege the September email was always a mere invention by appellees, never actually sent to or received by any person. In her deposition, McNabb testified she never sent the September email, stating she did not have "the slightest idea" who could have sent it, and that she believed it to be "[a] fraudulent document." (McNabb Depo. at 49.) Annie Ross-Womack, special assistant to McNabb at the time the September email was purportedly sent, testified she was in charge of transcribing and sending all emails from McNabb's NAACP email account, and to her knowledge McNabb did not send the September email. Ross-Womack found no evidence the September email was sent by McNabb after conducting a search of the computer from which it would have been sent. All alleged recipients of the September email filed affidavits attesting that a search of their email messages turned up no such correspondence from McNabb.

{¶ 17} Appellants presented ample evidence to doubt the existence of the September email. Appellants found it "very convenient" the email is dated September 15, 2013, as that is "[just] a few days within the statute of limitations." (Tr. at 102.) This fact appeared especially suspect to appellants because discovery requests should have previously elicited the September email, but appellees instead provided it only after the summary judgment motion that was "based on the statute of limitations." (Tr. at 102.) As noted by appellants, the email's date is suspect because NAACP suspended Williams' membership on September 13, 2013, and yet in the September email, dated September 15, 2013, McNabb implored the NAACP national office "to do something" about Williams. (Charles M. Curtin Depo., Ex. E.) Appellants maintain it would have made little sense for McNabb to behave as though NAACP had not yet disciplined Williams when in fact it had issued a significant reprimand just two days earlier. The September email also states Howell "has been told to file a police report," but about one month before this, on August 16, 2013, McNabb received an email from Howell claiming she had already filed a police report. Appellants doubt McNabb would have sent an email warning about the possibility that Howell may file a police report when Howell already told her the report had been filed.

{¶ 18} Appellants also raised the September email's rife misspellings and grammatical mistakes as additional indicators of fraud. Ross-Womack described McNabb

as a "perfectionist" in regard to her writing style.  (Tr. at 71.)  She testified McNabb would handwrite most emails, and Ross-Womack would then transcribe, edit, and send them from McNabb's official NAACP email account.  Ross-Womack claimed she reviewed 90 percent of McNabb's emails this way before they were sent, as well as monitoring all incoming and outgoing messages. The apparent discrepancies with McNabb's usual writing style, in addition to the sworn testimony from both McNabb and Ross-Womack disclaiming they drafted, sent, or even had knowledge of this email, lend credence to appellants' objection that McNabb did not draft or send the September email.

{¶ 19} The time stamp, subject line, recipient names, and signature lines of the September email also caused appellants to doubt its existence.  First, and perhaps most telling of all, the time indicated on the September email is "3:47 pm."  The email sent by Howell on August 15, 2013, in which she first made allegations against Williams, had an identical time stamp of "3:47 pm."  Appellants maintain that this time stamp, which is automatically populated by the email software and not typically subject to user interference, is "suspicious."  (Tr. at 105-06.)  According to appellants, it is far more likely Williams copied portions of other emails to create this fraudulent one, thus resulting in an email seemingly sent precisely one month, to the minute, after the original Howell email.  Next, the subject line of the September email is entirely blank, and so is the subject line of the email from "annr," who purportedly forwarded the email to Williams.  When drafting an original email message, the subject line will remain blank unless the sender manually inputs a subject.  When forwarding an email, however, the subject line will automatically contain some variation of "FW:," indicating the message below is forwarded from another sender.  While possible to delete this "FW:," it is at the very least unusual for a legitimate forwarded email to lack such an indicator. (Tr. at 106.)  Appellants, furthermore, suspected the September email was falsified due to the recipient names listed above the email message.  The sender who forwarded the September email to Williams, "annr," is not listed as a recipient of the original September email, and, seeing no indication of any intermediary forwarding messages to "annr," appellants "[do not] believe it is possible" for this person to forward the September email without receiving the message in the first place.  (Tr. at 106.)  Next, there are at least three copies of the September email included in the record—exhibits E, F, and G—and a side-by-side comparison of the three versions reveals discrepancies

appellants contend would not exist in the case of a real email message. According to the deposition testimony of Charles M. Curtin, appellants' expert in cybersecurity and forensic computer science, exhibits E and F appear to be a scan of the same physical document whereas exhibit G is a digital document that was not scanned from another. The email in exhibit G lists the name and email address of each recipient, whereas the same email in exhibits E and F lists only the name of each recipient. Additionally, the signature lines of the email in exhibits E and F are mostly double-spaced and the font size is similar to the text in the body of the email; the signature lines in exhibit G, though, are single-spaced and the font size is significantly larger than the text in the body of the email. Appellees presented no countervailing evidence to explain any of these aberrations, and the credible evidence presented here bolsters appellants' claim that the September email was a work of forgery.

{¶ 20} Finally, appellants denied the existence of the September email because of the digital format in which it was presented. Appellants had access to view the September email only as it appears in the record, as part of a PDF document. Appellants repeatedly requested that appellees produce the native format of the September email, but appellees either rebuffed or feigned confusion at each request. An email message's native format enables viewing of an email in its original electronic format rather than as part of a PDF document; this is used to verify the email message's sender and other pertinent information. Without access to native format, it is much more difficult to ascertain whether an email is authentic. Relatedly, appellants reasoned that Williams could not have had access to her NAACP email account during the course of discovery in this case because she was suspended and removed from office, and yet she somehow produced an electronic version of the September email. In light of Williams' claim that she did not know the person who forwarded her the September email, Williams arguably lacked a means to gain access to its digital format absent forgery.

{¶ 21} In order to prove damages, appellees claimed the alleged defamation caused Williams to lose income she would otherwise have made with her company, Diversity Inclusion Partners. Appellees also identified Melissa Patterson as a former business partner of Williams, providing appellants with an affidavit from Patterson and four supposed email messages between Williams and Patterson (collectively, "the Patterson

emails"). Appellants expressed grave doubt as to the very existence of Patterson, her affidavit, and the Patterson emails.

{¶ 22} Appellees presented Patterson's affidavit and the Patterson emails for the very first time in October 2017, more than four years after filing the complaint. Vardaro, attorney for NAACP, testified at the sanctions hearing that "Patterson's name had never appeared in the case before" the 2017 production of evidence, and that "prior to our filing a motion to compel, * * * there was nothing related to anything called Diversity Inclusion Partners." (Tr. at 122-23.) Appellants suspected this newfound evidence because, had something so crucial to their case been available from the start, they would have expected appellees to introduce it at that time. Instead, appellees waited roughly four years. In order to determine whether appellees' damages claims had any merit, appellants searched records kept by the Ohio Secretary of State. They found two entities named Diversity Inclusion Partners, both of which had been dissolved in 2011, and both of which named Varner, Williams' counsel at the time, in relation to each dissolution. Patterson's name was not included in a record containing a list of officers for Diversity Inclusion Partners. Appellants doubted Williams could have suffered any income loss as a result of the alleged 2013 defamation because the entity from which she claimed lost income was dissolved in 2011

{¶ 23} Appellees eventually filed the Patterson emails into the record, and appellants immediately suspected the documents were not legitimate. On their face, they appear to be work emails exchanged by Williams and Patterson, sent between March 2011 and September 2013. A critical examination of the apparent email messages, however, reveals errors and inconsistencies appellants claim are highly indicative of forgery. The email from Williams to Patterson on September 13, 2013 ("Patterson email #2"), for example, misspells Williams' email address in the address line as "nothe1st" when her actual email begins "noelthe1st." (Tr. at 129, Sanctions Hearing Ex. P at 2.) Appellants were skeptical that any actual email could possibly contain a misspelling in the "from" field—a skepticism affirmed by appellants' expert, Curtin, who testified the email address in the "from" field is automatically populated and "it is very unusual for there to be software that allows you to make changes to that." (Curtin Depo. at 33.) Additionally, the emails from Patterson to Williams on September 13, 2013 ("Patterson email #3"), and April 19,

2013 ("Patterson email #4"), share the exact same time stamp, down to the second, despite purportedly being sent about five months apart. Patterson emails #3 and #4 were apparently both sent at "8:17:38 PM." (Ex. P at 3.) It strains the credulity of this court to believe this was some extraordinary coincidence, especially considering this time stamp mirroring happened not once, but twice in emails filed by appellees. Appellants also noted the inconsistency of the background shading of the emails. In the email from Patterson to Williams on March 28, 2011 ("Patterson email #1"), the entire email message overlays a light gray shading. Patterson email #4 has shading behind only part of the signature line, whereas Patterson emails #2 and #3 have no shading whatsoever. In addition, there are unusual variations in the signature lines of the Patterson emails. In Patterson email #1, Patterson signs her name followed by a sign-off phrase within two quotation marks: "We bring favor to Projects." Patterson emails #3 and #4 use the same sign-off phrase, but in both there is no closing quotation mark. (Ex. P at 3 and 4.) A signature line that includes a job title and additional information such as this sign-off phrase are often automatically inserted, so it would be highly unusual for the same signature line to vary from message to message. Furthermore, appellants took issue with the subject line of Patterson email #3. Typically, the subject line of reply emails is the same as the original email but preceded by "RE:," an abbreviated form of the word "regarding." The subject line of Patterson email #2, for example, is "Urgent." The subject line of a typical reply to this email would read, "RE: Urgent." Patterson email #3, however, which purports to respond to Patterson email #2, is simply "Urgent." Because "RE:" automatically populates the subject lines of reply emails, Patterson in this case would have had to go out of her way to edit the subject line simply to delete the "RE:" but keep the "Urgent." (Tr. at 130.) Finally, there are typographical mistakes and inconsistencies between these four emails. Patterson emails #1 and #2 employ double spacing between certain lines, whereas Patterson emails #3 and #4 employ only single spacing. The time stamp in Patterson email #1 contains no a.m. or p.m. designation, but Patterson emails #2, #3, and #4 all specify a "PM" time stamp. The "From," "Sent," "To," and "Subject" of Patterson emails #1, #3, and #4 are all presented in bold text, but those same designations in Patterson email #2 are not bold. (Ex. P.) Appellees presented no evidence whatsoever to explain the many inconsistencies of the

Patterson emails. The weight of the evidence indicates appellees forged the Patterson emails for the specific purpose of supporting their damages claim.

{¶ 24} Like the September email discussed above, appellees failed to provide the Patterson emails in a verifiable electronic format. Appellants repeatedly asked for the Patterson emails in their native format, even explaining in detail what they meant by that technical term, but Varner exhibited confusion and ceased responding. The failure of appellees to provide the Patterson emails in their native format delayed the case and underscored appellant's allegations the messages were fabricated. Appellants' expert witness, Curtin, testified in his deposition the author of the PDF containing the emails is listed as "N Wms," which he believed to be an abbreviation of Noel Williams. (Curtin Depo. at 45.) If Williams had actually converted electronic versions of authentic email messages into a PDF format, she would have access to the native format. Her refusal or inability to produce the emails in their native format therefore lends credence to appellants' allegations that appellees forged the Patterson emails.

{¶ 25} Appellants next doubted Patterson's very existence, causing them to hire a private investigator to examine the contact information provided by appellees. The investigation unveiled the email address, phone number, and home address provided for Patterson were all associated with a person named Stephanie Monroe—none of the contact information appellees provided for Patterson unearthed any connections to a person named Melissa Patterson. Appellees also filed an affidavit purportedly signed by Patterson on December 27, 2017. The affidavit listed Patterson's home address in Portsmouth, Virginia, her phone number, and details about her business relationship with Williams. It additionally claimed Patterson's cell phone was part of a family plan and that Monroe is her relative. The affidavit stated Patterson had no desire to involve herself in Williams' case against NAACP and McNabb.

{¶ 26} Appellants contested the legitimacy of the affidavit. Varner first forwarded the Patterson affidavit to appellants in the form of an email attachment, yet, unusually, the forwarded email did not include the email address of whomever sent Varner the affidavit, nor did the forwarded email include the original email message itself. Appellants maintain the only plausible explanation for this omission is that Varner intentionally deleted the original email content, seeing as a forwarded email message ordinarily displays the content

of the original email. Appellants also questioned why Patterson, who claimed to be averse to participating in this case, willingly signed an affidavit to be used by appellees. Appellants stated they never made any attempt to contact Patterson prior to her signing the affidavit. Next, appellants called attention to the fact that Patterson allegedly lived in Portsmouth, Virginia, at all relevant times during this case, and yet a Columbus notary signed the affidavit. Appellees responded that Patterson signed the affidavit while visiting family over the holidays. Particularly damaging to appellees' defense of Patterson's existence is that calls made to the phone number listed for Patterson were answered by Monroe. In a vain attempt to explain why Monroe would pick up a phone call placed to Patterson, appellees claimed Patterson and Monroe are cousins that share a family cell phone plan. Sharing a cell phone plan, however, fails to account for one member of the plan answering another member's phone. Appellants point out that, even in the unlikely scenario that two cousins who live in different states share a cell phone plan, each individual would retain a unique telephone number. The circumstances of the affidavit and efforts to contact Patterson, much like the irregularities of the Patterson emails, support appellants' contentions that appellees engaged in deceitful litigation practices.

{¶ 27} A comprehensive review of the record reveals a lack of competent, credible evidence supporting the trial court's decision denying sanctions against appellees. As described above, R.C. 2323.51(A)(2)(a)(iii) permits a court to sanction a party or a party's counsel if they make allegations without evidentiary support or allegations unlikely to have evidentiary support after further investigation. An appellate court under R.C. 2323.51(A)(2)(a)(iii) determines whether the record contains competent, credible evidence to support the trial court's findings. If the record contains no such support, the appellate court will then find the trial court's judgment against the manifest weight of the evidence, thereby permitting it to weigh the evidence and render the proper judgment. App.R. 12(C)(1). An extensive review of the record reveals appellees committed grave litigation misconduct. Appellees filed a defamation claim outside the statute of limitations, then entered the fraudulent September email into evidence to remedy that fatal defect in the initial claim. Later, when appellants questioned appellees' evidence of damages, appellees filed the four fraudulent Patterson emails to render the damages claim plausible. Appellants also presented largely unrebutted evidence that appellees' witness, Patterson,

was never a real person—appellees seemingly invented her identity in an attempt to verify their damages claim. These dishonest submissions of evidence transformed a case that should have been promptly dismissed into a dispute that has spanned nearly a decade, running up appellants' legal costs in their defense against frivolous allegations and falsified evidence. They have also burdened this court and the trial court with years of litigation that was, in retrospect, futile from the start. Such actions surely merit sanction. Accordingly, we find the weight of the competent, credible evidence clearly demonstrates the existence of frivolous conduct under R.C. 2323.51(A)(2)(a)(iii). Because the trial court concluded the evidence was not sufficient to find frivolous conduct, the trial court erred.

{¶ 28} R.C. 2323.51(A)(2)(a)(ii) permits a court to sanction a party or a party's counsel if they engage in conduct that is not warranted under existing law and that cannot be supported by a good-faith argument to change existing law. A court examining conduct under this statute employs an objective test in which ignorance of the law or a failure to investigate the law is not objectively reasonable. An appellate court applies a de novo standard of review under R.C. 2323.51(A)(2)(a)(ii) because such determinations inherently involve a legal analysis. In the present case, appellees filed a claim for defamation on September 12, 2014 regarding a written statement sent by McNabb on August 15, 2013. "An action for libel * * * shall be commenced within one year after the cause of action accrued." R.C. 2305.11(A). Appellees commenced this defamation action nearly one year and a month after McNabb's allegedly defamatory statement, in direct violation of R.C. 2305.11(A). Absent some evidence that McNabb made a defamatory statement within one year of the filing date, "no reasonable lawyer would have brought the action in light of the existing law." *Calypso Asset Mgt. L.L.C., v. 180 Indus., L.L.C.,* 10th Dist. No. 20AP-122, 2021-Ohio-1171, ¶ 61, citing *Southard Supply, Inc. v. Anthem Contrs., Inc.,* 10th Dist. No. 16AP-545, 2017-Ohio-7298, ¶ 29. The complaint alleged no defamatory statement that fell within the one-year statute of limitations, and any such evidence presented in discovery proved to be mere forgery. Accordingly, Williams' defamation claim was not warranted by existing law, and pursuit of this claim amounted to frivolous conduct within the meaning of R.C. 2323.51(A)(2)(a)(ii). The trial court erred, therefore, in failing to find Williams' and Varner's conduct amounted to frivolous conduct within the meaning of R.C. 2323.51(A)(2)(a)(ii).

{¶ 29} Having found the trial court erred in failing to find frivolous conduct under R.C. 2323.51, we must determine the appropriate remedy. Here, because the conduct of Williams and Varner was particularly egregious and abusive of the judicial process, we find the trial court abused its discretion in failing to award sanctions to appellants. *Vineyard Christian Fellowship of Columbus v. Anderson*, 10th Dist. No. 15AP-151, 2015-Ohio-5083, ¶ 41, citing *State ex rel. Striker v. Cline*, 130 Ohio St.3d 214, 2011-Ohio-5350, ¶ 11, and *Sopp v. Turner*, 10th Dist. No. 10AP-25, 2010-Ohio-4021, ¶ 9 ("[a]ppellate review of a decision to grant or deny sanctions under R.C. 2323.51 is under an abuse of discretion standard"). This is the exceedingly rare case where we must direct the trial court to award sanctions to appellants for Williams' and Varner's frivolous behavior. Thus, we remand this matter to the trial court with instructions to grant appellants' motion for sanctions and determine the appropriate amount of the award. We also note, for clarification, that the award of sanctions is against Williams and Varner but does not apply to Grosshandler or Pullen. We therefore sustain appellants' sole assignment of error to the extent it contends the trial court erred in failing to award sanctions against Williams and Varner pursuant to R.C. 2323.51.

## IV. Conclusion

{¶ 30} Based on the foregoing, the trial court erred in denying appellants' motion for sanctions against Williams and Varner under R.C. 2323.51. Having sustained appellants' sole assignment of error, we reverse the judgment of the Franklin County Court of Common Pleas and remand the matter to that court with instructions to grant appellants' motion for sanctions and enter an award against Noel Williams and Carrie Varner.

*Judgment reversed;*
*cause remanded with instructions.*

LUPER SCHUSTER and JAMISON, JJ., concur.

———————————